**In The Matter Of The Proposed Amended Rules And Regulations Governing The Diversion And Use Of Tributary Ground Water In The South Platte Basin, Colorado:**

**Hal D. SIMPSON, State Engineer, Appellants,**

v.

**BIJOU IRRIGATION CO.; Bijou Irrigation District; Ducommun Business Trust; Farmers Highline Canal & Reservoir Company; City of Lafayette; Mountain Mutual Reservoir Co; City of Westminster; Varra Companies, Inc.; Sand Land Inc.; Pasquale Varra; Centennial Water and Sanitation District; City of Boulder; Center of Colorado Water Conservancy District; Peterson Ditch Co.; City of Brighton; City of Aurora; City of Englewood; Magness Land Holdings, LLC.; Magness Platteville, LLC; Kplattevill LLC; South Reservation Ditch Co.; Central Colorado Water Conservancy District and the Ground Water Management Subdistrict of the Central Water Conservancy District; Lower South Platte Water Conservancy District; City of Greeley; Fort Morgan Reservoir & Irrigation Co.; North Sterling Irrigation District; the Harmony Ditch Co.; Jackson Lake Reservoir and Irrigation Co.; Anderson Ditch Co.; Fort Morgan Water Co., Ltd; Liddle Ditch Co; City and County of Denver; Farmers Reservoir & Irrigation Co; Henrylyn Irrigation District; Groundwater Appropriators of the South Platte River Basin, Inc.; Riverside Irrigation District; Riverside Reservoir and Land Company; Lower Platte & Beaver Canal Company; Highland Ditch Company; Water Users Association of District No. 6; City of Sterling; Bruce Gerk and Donald Sellman Shareholders In Petersen Ditch Company and Julesburg Irrigation District; City of Thornton; City of Blackhawk, Appellees.**

No. 02SA377.

Supreme Court of Colorado,
En Banc.

April 30, 2003.

As Modified on Denial of Rehearing
May 27, 2003.

Ken Salazar, Colorado Attorney General, Felicity Hannay, Deputy Attorney General, Steven O. Sims, Assistant Attorney General, Carol Angel, Assistant Attorney General, Alexandra Davis, Assistant Attorney General, Chad M. Wallace, Assistant Attorney General, Federal and Interstate Water Unit, Natural Resources and Environment Section, Denver, Colorado, for Appellant Hal D. Simpson.

Vranesh & Raisch, LLP, Michael D. Shimmin, Lisa C. Ledet, Boulder, Colorado, for Appellee Bijou Irrigation Company and Bijou Irrigation District.

White & Jankowski, LLP, David C. Taussig, William A. Hillhouse, II, David F. Jankowski, Denver, Colorado, for Appellee Ducommun Business Trust and City of Sterling.

Brice Steele, Brighton, Colorado, for Appellee Farmers' High Line Canal and Reservoir Company.

David C. Lindholm, Boulder, Colorado, for Appellee City of Lafayette & Mountain Mutual Reservoir Company.

Carlson, Hammond & Paddock, LLC, Mary Mead Hammond, Lee H. Johnson, Denver, Colorado, for Appellee City of Westminster.

Petrock & Fendel, PC, Frederick A. Fendel, III, Bill Downey, Denver, Colorado, for

Appellees Varra Companies, Inc., Sand Land, Inc., and Pasquale Varra.

Moses, Wittemyer, Harrison and Woodruff, PC, Veronica A. Sperling, Gabriel D. Carter, Boulder, Colorado, for Appellees Centennial Water and Sanitation District, and City of Boulder.

Felt, Monson & Culichia, LLC, James W. Culichia, James G. Felt, Colorado Springs, Colorado, for Appellee The Center of Colorado Water Conservancy District.

Fischer, Brown & Gunn, PC, William H. Brown, Fort Collins, Colorado, for Appellee The City of Brighton.

Duncan, Ostrander & Dingess, PC, John M. Dingess, James Birch, Denver, Colorado, for Appellee City of Aurora Acting by and through its Utility Enterprise.

Berg Hill Greenleaf & Ruscitti LLP, David G. Hill, Melissa M. Heidman, Boulder, Colorado, for Appellee City of Englewood.

Robert E. Schween, Littleton, Colorado, for Appellee Magness Land Holdings, LLC.

Lind Lawrence & Ottenhoff LLP, Kim Lawrence, Greeley, Colorado, for Appellees South Reservation Ditch Company; Central Colorado Water Conservancy District and The Ground Water Management Subdistrict of the Central Colorado Water Conservancy District; Lower South Plate Water Conservancy District.

Trout, Witwer & Freeman, PC, James S. Witwer, Douglas M. Sinor, Denver, Colorado, for Appellee City of Greeley Acting by and Through its Water and Sewer Board.

Timothy R. Buchanan, Arvada, Colorado, for Appellees Fort Morgan Reservoir & Irrigation Company; North Sterling Irrigation District; The Harmony Ditch Company; Jackson Lake Reservoir and Irrigation Co.; Anderson Ditch Company; Fort Morgan Water Company LTD; Liddle Ditch Company.

Michael L. Walker, Denver Water Board, Patricia L. Wells, Assistant Denver City Attorney, Denver, Colorado, for Appellee City and County of Denver.

John P. Akolt, III, Brighton, Colorado, for Appellee Farmers Reservoir & Irrigation Company.

Steve L. Janssen, Boulder, Colorado, for Appellee Henrylyn Irrigation District.

Hill & Robbins PC, David W. Robbins, David M. Montgomery, Avi S. Rocklin, Mark J. Wagner, Denver, Colorado, for Appellees Groundwater Appropriations of the South Platte River Basin Inc., Riverside Irrigation District; Riverside Reservoir and Land Company; Lower Platte & Beaver Canal Company.

Bernard, Gaddis Lyons, & Kahn P.C., Wendy S. Rudnik, Jeffery J. Kahn, Longmont, Colorado, for Appellees Highland Ditch Company; Water Users Association of District No. 6.

Bruce Gerk and Donald Spillman, Pro Se as Shareholders in Appellees Petersen Ditch Company and Julesburg Irrigation District, Denver, Colorado.

Dennis A. Hansen, Assistant City Attorney, Thornton, Colorado, for Appellee City of Thornton.

Harvey W. Curtis, David L. Kueter, Patricia A. Madsen, Denver, Colorado, for Appellee City of Blackhawk.

Merrill, Anderson, King & Harris, LLC, Paul G. Anderson, Colorado Springs, Colorado, for Amicus Curiae Arkansas Groundwater Users Association.

MacDougall Woldridge & Worley PC, Malcom E. MacDougall, Colorado Springs, Colorado, for Amicus Curiae Colorado Water Protective & Development Association.

Burns, Figa & Will PC, Lee E. Miller, Stephen H. Leonhardt, Englewood, Colorado, for Amicus Curiae Southeastern Colorado Water Conservancy District.

Justice RICE delivered the Opinion of the Court.

## I. INTRODUCTION

On May 31, 2002, the State Engineer filed with the water court his proposed "Amended Rules and Regulations Governing the Diversion and Use of Tributary Ground Water in the South Platte River Basin, Colorado." His stated intent for promulgating these rules was twofold: first, to provide for replacement of injurious out-of-priority ground-

water depletions to prevent injury to senior water rights in Colorado in a manner that allows the continuance of existing uses and assures maximum beneficial use of the waters of the state; and second, to ensure that depletions which would diminish the surface flow of the South Platte River at the Interstate Station in violation of the South Platte River Compact are replaced. This case examines the extent of the statutory authority granted the State Engineer to promulgate and enforce these rules.

 We affirm in part, reverse in part, and remand. First, although the State Engineer may promulgate rules for the South Platte River basin pursuant to his rulemaking power under section 37–92–501, 10 C.R.S. (2002) (referred to hereinafter as the "water rule power,"[1]), we find that that power does not extend to State Engineer authorization of out-of-priority groundwater depletions requiring "replacement plans"[2] that are not conditioned on an augmentation plan application having been filed in water court. We therefore affirm the trial court by holding that the State Engineer can approve temporary "replacement plans" only pursuant to the provisions set forth in sections 37–92–308(3), (4), (5), and (7). To the extent that

the proposed rules exceed these provisions, we hold they are contrary to law.

Second, we recognize the State Engineer's separate basis of authority to promulgate rules and regulations necessary to enforce interstate compacts pursuant to section 37–80–104, 10 C.R.S. (2002) (referred to hereinafter as the "compact rule power"[3]). We find that as a result of changed conditions that have occurred since the compact was created, the South Platte River Compact is deficient in establishing standards for administration within Colorado. We therefore reverse the trial court's holding that the compact is self-executing and administrable pursuant to its own terms such that no further regulations are necessary to ensure compliance. We further hold that in exercising his compact rule power the State Engineer is constrained by all of the statutory conditions imposed on his water rule power, including those set forth in section 37–92–308, 10 C.R.S. (2002).

Third, we affirm the trial court's holding that proposed rules cannot take effect until all protests have been filed pursuant to the requirements set forth in sections 37–92–501(3)(a) and 37–92–304, 10 C.R.S. (2002), and resolved by the water court. We recognize that, to the extent other portions of this

---

1. Section 37–92–501(1), 10 C.R.S. (2002), provides that the State Engineer "shall administer, distribute, and regulate the waters of the state," and "may adopt rules and regulations to assist in" the performance of his duties. We have adopted the phrase "water rule power" to refer to this authority from *Kuiper v. Gould*, 196 Colo. 197, 201, 583 P.2d 910, 913 (Colo.1978).

2. We note that the term "replacement plan" is undefined by statute and the 2002 proposed rules. We have therefore applied an operative definition, and find that a "replacement plan" is the functional equivalent of a "substitute supply plan," and refers to the source of water that a junior or undecreed well user makes available to a senior appropriator to offset any injury caused to the senior by the junior's or undecreed well user's out-of-priority depletions. *See also Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1154 (Colo.2002) ("The terms 'substitute supply' and 'replacement water' are undefined by statute but are substantially equivalent. They refer to the water supplied to decreed water rights holders under an exchange or augmentation plan."). An augmentation plan, then, is also the functional equivalent of a substitute supply plan or "replacement plan," but, significantly, has been

sanctioned by court decree and thereby renders the out-of-priority diversion no longer susceptible to curtailment by the State Engineer pursuant to sections 37–92–501(1) and 37–92–502(2)(a), 10 C.R.S. (2002), provided that the replacement water is supplied to avert injury to senior rights.

3. Section 37–80–104, 10 C.R.S. (2002), provides as follows:

> The state engineer shall make and enforce such regulations with respect to deliveries of water as will enable the state of Colorado to meet its compact commitments. In those cases where the compact is deficient in establishing standards for administration within Colorado to provide for meeting its terms, the state engineer shall make such regulations as will be legal and equitable to regulate distribution among the appropriators within Colorado obligated to curtail diversions to meet compact commitments, so as to restore lawful use conditions as they were before the effective date of the compact insofar as possible.

We have adopted the phrase "compact rule power" to refer to this authority from *Kuiper v. Gould*, 196 Colo. 197, 201, 583 P.2d 910, 913 (Colo.1978).

opinion reverse the trial court, the question regarding the effective date of the rules has been mooted. Because the situation is one capable of repetition yet evading review, however, we find the issue warrants an exception to the mootness doctrine.

We remand with orders for the trial court to review any further proceedings in the matter of rules for the South Platte River basin in a manner consistent with this opinion.

## II. FACTS AND PROCEDURAL HISTORY

On May 31, 2002, the State Engineer filed "Amended Rules and Regulations Governing the Diversion and Use of Tributary Ground Water in the South Platte River Basin, Colorado" with the Weld County Court in Water Division I. The proposed rules reorganized and partially repealed the extant rules for the South Platte River Basin which were adopted on March 15, 1974. The State Engineer asserted two independent bases for his authority to promulgate the proposed rules: the water rule power set forth in section 37–92–501(1), 10 C.R.S. (2002), and the compact rule power set forth in section 37–80–104, 10 C.R.S. (2002).

The proposed rules apply to all diversions of tributary groundwater in the South Platte River basin by wells that were in existence on or before July 1, 1972, and consist of sixteen separate regulations, setting out (1) assumptions, methods, and criteria for determining out-of-priority groundwater depletions; (2) curtailment and replacement requirements for out-of-priority groundwater depletions; (3) authority for the water courts or the State Engineer to approve "replacement plans" whereby well users may replace their out-of-priority groundwater depletions with water from other sources; (4) a notice and comment procedure regarding State Engineer-approved "replacement plans"; (5) well user responsibilities and reporting requirements; and (6) State and Division Engineer responsibilities.

The primary source of controversy in the proposed South Platte River basin rules centers around the State Engineer's self-proclaimed authority to unilaterally approve "replacement plans" for out-of-priority groundwater depletions by pre–1972 wells. As outlined in the proposed rules, "replacement plans" are a means by which undecreed, pre–1972 well users can avoid curtailment by the State Engineer by making up the water shortfall to senior appropriators by replacing the injurious depletions of water they divert from their wells with water from another legally available source. The terms of the rules make it clear that such "replacement plans" are considered temporary in nature, subject to an annual review by the State Engineer, and are not subject to Colorado's statutory adjudication procedure. Although Rule 10.1(2) appears to contemplate eventual adjudication of "replacement plans" by the water court through the augmentation plan procedure, the rule is ambiguous as to when this must occur, and there is nothing in the rules otherwise that prevents the State Engineer from granting annual approval indefinitely.

In accordance with the requirements of section 37–92–501(2)(g), 10 C.R.S. (2002), notice of the proposed rules was included in the May 2002 résumé for Water Division 1 and published in June. The rules were to become effective on December 31, 2002. Thirty-seven protests were filed pursuant to section 37–92–501(3), alleging that the State Engineer lacked the requisite statutory or interstate compact authority to adopt the rules as proposed; a number of protestors subsequently moved for summary judgment on the same basis.

On September 26, 2002, protestors filed a motion pursuant to C.R.C.P. 56(h), requesting the court to find that the proposed rules could not become effective until all protests had been heard and a final ruling issued by the water judge. The movants based their claim on the procedural due process requirements set forth in sections 37–92–501(3) and 37–92–304, 10 C.R.S. (2002), and the collateral estoppel effect of three prior water court decisions to which the State Engineer was a party. The State Engineer countered that the previous decisions did not warrant collateral estoppel effect, and that the sixty-day publication requirement set forth in section

37–92–501(2)(g)[4] was the only limitation as to when proposed rules could take effect.

In a preliminary order addressing only the effective date of the rules, the water judge held that if any protests to proposed rules are filed, the effective date of the rules must be stayed until all objections have been heard and resolved by the water court. The water judge agreed with the State Engineer as to the collateral estoppel effect of the prior cases, but disagreed with his interpretation of section 37–92–501(2)(g). The water judge concluded that although there was no express limitation in section 37–92–501(2)(g) as to the effective date of proposed rules other than the sixty-day publication requirement, due process nevertheless demanded that protests be heard and resolved prior to the rules taking effect.[5]

Thereafter the State Engineer moved, pursuant to C.R.C.P. 56(h), for a ruling by the water court affirming his authority, both under his water rule power and his compact rule power, to promulgate the 2002 rules.

On December 30, 2002, the court declared the rules void in their entirety, thereby granting the protestors' initial motion for summary judgment in which they sought a ruling that the State Engineer was without the requisite statutory authority to promulgate the proposed rules.

In so ordering, the water judge refuted the State Engineer's claim that his approval of "replacement plans" was simply a function of his curtailment authority, limited by the material injury requirement, set forth in sections 37–92–501(1) and 37–92–502(2)(a). The judge noted that although section 37–92–502(2)(a) sets forth several factors that the State Engineer can consider in deciding whether an out-of-priority diversion impairs a senior right and therefore must be curtailed, an analysis of replacement water was not among them, and therefore constituted a decision outside the purview of the State Engineer. The court observed that to hold otherwise would fly in the face of legislative history concerning the State Engineer's authority with respect to augmentation plans, this court's language in *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139 (Colo.2001), and the legislative intent evidenced in the recently enacted section 37–92–308, 10 C.R.S. (2002). Taking these factors in their totality, the court concluded that the legislature had intended to restrict the State Engineer's authority to approve temporary augmentation plans to the four narrowly circumscribed situations set forth in sections 37–92–308(3), (4), (5), and (7).

The water court also concluded that the State Engineer had no authority to promulgate the proposed rules pursuant to his compact rule power under section 37–80–104 because the South Platte River Compact was administrable in Colorado as an 1897 priority and hence self-executing. Therefore, the court reasoned, the compact rule power was not implicated because the compact was not "deficient in establishing standards for administration within Colorado to provide for meeting its terms." § 37–80–104, 10 C.R.S. (2002).

The State Engineer appealed the trial court's ruling to this court, and we granted

---

**4.** That section provides as follows:

That time being of the essence, rules and regulations and changes thereof proposed for an aquifer shall be published once in the county or counties where such aquifer exists not less than sixty days prior to the proposed adoption of such rules and regulations, and copies shall be mailed by the water clerk of the division to all persons who are on the mailing list of such division. Copies of such proposed regulations shall be available without charge to any owner of a water right at the office of the water clerk.

**5.** On October 3, 2002, several protestors filed a second motion for summary judgment, this time claiming that implementation of the rules was legally precluded by the fact that as a condition of water court approval of the original South Platte basin rules in 1974, the State Engineer had stipulated that he would never thereafter approve temporary plans for augmentation in the absence of a decreed augmentation plan or an application pending in water court. The protestors therefore asserted that promulgation of the proposed rules was barred by principles of collateral estoppel. The court rejected this motion, holding that neither the stipulation nor the decree expressly addressed the State Engineer's authority to approve augmentation plans or the extent of his curtailment authority. This ruling was not appealed to us; hence, we have declined to address it herein.

an expedited review.[6]

## III. STANDARD OF REVIEW

■ We review de novo the water court's interpretations and applications of Colorado statutes or case law, *Municipal Subdistrict, Northern Colorado Water Conservancy District v. Getty Oil Exploration Co.,* 997 P.2d 557, 561 (Colo.2000), as we do any order of a lower court granting a motion for summary judgment. *Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215, 1218 (Colo.2002).

■ Summary judgment is proper only when the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Martini v. Smith,* 42 P.3d 629, 632 (Colo. 2002). De novo review is proper in such cases because all summary judgments are rulings of law in the sense that they do not rest on the resolution of disputed facts. *Id.* (quoting *Feiger, Collison & Killmer v. Jones,* 926 P.2d 1244, 1250 (Colo.1996)). We therefore review all issues appealed to us from the water court according to a de novo standard of review.

## IV. ANALYSIS

The State Engineer contends that his ability to promulgate the revised South Platte River basin rules is founded upon both his water rule power and his compact rule power. We first discuss the water rule power which allows the State Engineer to make rules and regulations to "assist in" the performance of his duties. § 37–92–501(1), 10 C.R.S. (2002). Our examination of legislative history, prior case law, and the recent legislative enactment of section 37–92–308 convinces us that the General Assembly intended approval of all out-of-priority uses of water involving replacement water—regardless of whether those uses are termed "replacement plans," substitute supply plans, or augmentation plans—to be the sole province of the water courts, with the exception of the limited circumstances provided for in sections 37–80–120(5), 37–90–137(11)(b), and 37–92–308(3), (4), (5), and (7), 10 C.R.S. (2002). We therefore hold that, to the extent that State Engineer approval of "replacement plans" in the proposed rules exceeds these limitations, they are outside his statutory authority and contrary to law.

We then discuss the State Engineer's compact rule power pursuant to his duty to "ensure compliance with interstate compacts." § 37–80–104, 10 C.R.S. (2002). This section includes an overview of the delivery require-

---

6. The following issues were appealed to us pursuant to C.A.R. 1(a)(2):

1. Whether the water judge erred in finding that the State Engineer's 2002 Amended Rules and Regulations Governing the Diversion and Use of Tributary Ground Water in the South Platte River basin were void as being contrary to statute.

2. Whether the water judge erred in finding that the State Engineer does not have the authority to approve rules which allow out-of-priority diversions pursuant to replacement plans not approved by the water judge.

3. Whether the water judge erred in finding that any water user wishing to divert out-of-priority must secure a water court decreed plan for augmentation or otherwise comply with the provisions of section 37–92–308, 10 C.R.S. (2002).

4. Whether the water judge erred in finding that State Engineer rulemaking authority pursuant to section 37–92–501, 10 C.R.S. (2002) is bound by the limitations of section 37–92–308, 10 C.R.S. (2002) and cannot circumvent its restrictions under the guise of enforcement discretion.

5. Whether the water judge erred in finding that the State Engineer, when exercising enforcement discretion concerning the curtail-

ment of junior priorities does not have the authority to make any determination with respect to material injury to senior rights to the extent that such determination entails an analysis of depletions and sufficiency of replacement water.

6. Whether the water judge erred in finding that the State Engineer did not have authority to approve replacement plans pursuant to the compact regulation authority contained in section 37–80–104, 10 C.R.S. (2002).

7. Whether the water judge erred in finding that no regulations other than the enforcement of an 1897 priority are needed to administer well uses under the South Platte River Compact, section 37–65–101, 10 C.R.S. (2002).

8. Whether the water judge erred in finding that the State Engineer did not have the authority to allow temporary use of water in replacement plans that had not been decreed for replacement or augmentation purposes.

9. Whether the water judge erred in finding that State Engineer rules and regulations promulgated pursuant to section 37–92–501, 10 C.R.S. (2002), could not be effective until all protests to the amended rules were resolved following a hearing on the merits.

ments of the South Platte River Compact, a discussion of the role of the State Engineer in enforcing compacts, and our analysis of the State Engineer's authority to make rules to enforce the terms of the compact. We conclude that the water judge erred by holding that the South Platte River Compact is administrable solely as an 1897 priority, and that the State Engineer's compact rule power under section 37–80–104 was not implicated. We nevertheless hold that the State Engineer's compact rule power can be exercised only in compliance with all other provisions of the statutory scheme.

Finally, we address the question of whether rules and regulations promulgated pursuant to the water rule power can take effect before all protests have been heard and resolved, and conclude that they cannot.

### A. The State Engineer's Rulemaking Authority Pursuant to the Water Rule Power (Section 37–92–501, 10 C.R.S. (2002))

Pursuant to the water rule power, the State Engineer has the authority to adopt rules and regulations to assist him in his duties of "administer[ing], distribut[ing], and regulat[ing] the waters of the state," expressly including groundwater. § 37–92–501(1), 10 C.R.S. (2002). The existence of that authority and its exercise in promulgating the proposed rules is not at issue in this case; rather, what is at issue is the extent and scope of that authority. We therefore begin our analysis with an examination of the legislative history of the State Engineer's administrative role in regulating the integrated use of surface and groundwater.

### 1. Legislative History of the State Engineer's Administrative Role in the Integrated Use of Ground and Surface Water

■ Our primary responsibility in any statutory analysis is to give effect to the legislative intent motivating the enactment of the statute. *People v. Norton,* 63 P.3d 339, 343 (Colo.2003). When our analysis involves, as it does here, a number of interrelated statutory sections, we must endeavor to give consistent, harmonious, and sensible effect to the statutory scheme as a whole. *Martin v. People,* 27 P.3d 846, 851 (Colo.2001); *see also Bynum v. Kautzky,* 784 P.2d 735, 738 (Colo. 1989) ("If possible, we must try to reconcile statutes governing the same subject."). Finally, in interpreting such a comprehensive legislative scheme, "we must construe each provision to further the overall legislative intent behind the statutes." *Martin,* 27 P.3d at 851.

### a. Groundwater Management Act of 1965

■ By the early 1940s, in the South Platte River basin and elsewhere, agricultural activity was causing huge increases in the withdrawal of tributary groundwater, which was in turn beginning to deplete the surface flows of the major rivers.[7] *See* Lawrence J. MacDonnell, *Colorado's Law of "Underground Water": A Look at the South Platte Basin and Beyond,* 59 U. Colo. L.Rev. 579, 585 (1988). By the 1960s, the conflict this created between surface and ground water users had become readily apparent, as had the dearth of legislative guidance and administrative authority necessary to address the problem.

In 1965, the General Assembly enacted the Groundwater Management Act, which provided that the State Engineer was to administer both surface and groundwater of the state in accordance with the priority system. Ch. 318, secs. 1–2, § 148–11–22, 1965 Colo. Sess. Laws 1244, 1244–45. Interpreting the constitutionality of that Act in *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968), this court held that any regulation of wells must: (1) be in compliance with written rules

---

7. Tributary groundwater is by definition hydrologically connected to the surface water of a stream. Therefore, groundwater pumping can deplete water that would otherwise be available for withdrawal directly from the surface of the stream. In recognition of this fact, absent a showing to the contrary, Colorado law presumes that (1) groundwater is tributary to the stream,

*Board of County Commissioners v. Park County Sportsmen's Ranch,* 45 P.3d 693, 702 (Colo. 2002), and (2) that where surface water is over-appropriated, groundwater depletion through well pumping causes material injury to senior appropriators. *Alamosa–La Jara Water Users Prot. Ass'n v. Gould,* 674 P.2d 914, 931 (Colo. 1983).

and regulations; (2) cause a reasonable lessening of material injury to seniors; and (3) provide for conditional use of wells if water can be withdrawn and put to beneficial use without injury to seniors. *Fellhauer*, 167 Colo. at 334, 447 P.2d at 993. The court also articulated the need for maximum utilization of both the surface and subsurface waters of the state, and the necessity of determining "how constitutionally that doctrine can be integrated into the law of vested rights." *Fellhauer*, 167 Colo. at 336, 447 P.2d at 994.

### b. Water Right Determination and Administration Act of 1969

The implicit invitation extended in *Fellhauer* prompted the General Assembly in 1969 to take further action with respect to groundwater administration in the state. The Water Right Determination and Administration Act of 1969 was the most comprehensive water legislation ever enacted in the history of the state. *See* ch. 373, sec. 1, §§ 148–21–1 through 148–21–45, 1969 Colo. Sess. Laws 1200, 1200–1219. The purpose of the Act was "to integrate the appropriation, use and administration of underground water tributary to a stream with the use of surface water, in such a way as to maximize the beneficial use of all of the waters of this state." *Id.*, § 148–21–2(1) at 1200 (currently codified at § 37–92–102(1)(a), 10 C.R.S. (2002)).

The Act ushered in a host of changes to the state water law administrative scheme. It established the current system of water divisions and courts, *id.*, sections 148–21–8 through 148–21–11 at 1202–05 (currently codified at sections 37–92–201 through 37–92–204, 10 C.R.S. (2002)), and set forth detailed administrative duties of the State and Division Engineers, particularly with regard to the integration of groundwater into the water law system. *Id.*, §§ 148–21–17 through 148–21–45 at 1205–19 (currently codified at §§ 37–92–301 through 37–92–504, 10 C.R.S. (2002)).

As a result of the Act's stated policy of conjunctive use,[8] wells were required to be integrated into the priority system, although unadjudicated wells in existence prior to 1969 were allowed to continue. *See id.*, § 148–21–2(2)(a) at 1200 01 ("Water rights and uses heretofore vested in any person by virtue of previous or existing laws, *including an appropriation from a well,* shall be protected subject to the provisions of this article.") (emphasis added) (currently codified at § 37–92–102(2)(a), 10 C.R.S. (2002) in slightly modified form).[9] The Act nevertheless encouraged the adjudication of existing wells by allowing well owners who filed an application by July 1, 1971, to receive a water decree with a priority dating back to their original appropriation date. *Id.*, § 148–21–22 at 1212.

The 1969 Act also introduced the concept of augmentation plans into the water law adjudication and administration scheme. Augmentation plans were the primary means provided by the Act for integrating groundwater into the state priority system, and were defined as follows:

> "Plan for augmentation" means a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means.

*Id.*, § 148–21–3(12) at 1202 (currently codified at § 37–92–103(9), 10 C.R.S. (2002) in slightly modified form).[10] An augmentation

---

**8.** The term "conjunctive use" refers to the combined priority administration of ground and surface waters of the state. James N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 16 (rev. ed.1999).

**9.** The current version reads:

> Water rights and uses vested prior to June 7, 1969, in any person by virtue of previous or existing laws, including an appropriation from a well, shall be protected subject to the provisions of this article. § 37–92–102(2)(a), 10 C.R.S. (2002).

**10.** There are two modifications to the current version of 37–92–103(9), 10 C.R.S. (2002). First is the addition of a clause to the first sentence: " 'Plan for augmentation' means a detailed program, *which may be either temporary or perpetual in duration,* to increase the supply of water available ...." (emphasis added). Second is the addi-

plan is essentially a water court decreed means by which a junior appropriator or undecreed well user can replace his out-of-priority depletions of groundwater in a manner that prevents injury to senior rights. Therefore, when decreed by the water court, an augmentation plan allows the water user to divert out of priority without threat of curtailment by the State Engineer, so long as adequate replacement water is, in fact, supplied to the senior.[11]

Approval of augmentation plans was expressly vested in the water courts for augmentation plan applications received prior to July 1, 1971. Ch. 373, sec. 1, § 148–21–23(2), 1969 Colo. Sess. Laws 1200, 1212.[12] Notably, a proposed but unenacted version of the 1969 Act would have granted the State Engineer, instead of the water courts, the authority to approve augmentation plans. S.B. 81, 47th Gen. Assemb., Reg. Sess. at 12 (Colo.1969). The bill was defeated, however, in large part because of fierce opposition to the considerable amount of power the proposed bill would have vested in the State Engineer, and the fear of creating a "water czar" on the river. David L. Harrison & Gustave Sandstrom, Jr., *The Groundwater–Surface Water Conflict and Recent Colorado Water Legislation*, 43 U. Colo. L.Rev. 1, 23–24 (1971).

### c. The 1974 and 1977 Amendments

In response to the large number of augmentation plan applications which had been

filed, in 1974 the General Assembly vested the State Engineer with the authority to grant temporary approval of augmentation plans. Significantly, however, a precondition to even temporary approval by the State Engineer was that the water user had an augmentation plan application pending in water court. Ch. 111, sec. 1, § 148–21–23(2), 1974 Colo. Sess. Laws 440, 440 (later codified at § 37–92–307); *see also Empire Lodge*, 39 P.3d at 1151.

In an effort to address the concern expressed by this court about the constitutionality of the 1974 amendments in *Kelly Ranch v. Southeastern Colorado Water Conservancy District*, 191 Colo. 65, 75, 550 P.2d 297, 304 (1976),[13] however, the General Assembly in 1977 repealed the State Engineer's authority to approve temporary augmentation plans. Ch. 483, sec. 6, 1977 Colo. Sess. Laws 1702, 1704 (repealing § 37–92–307). Before passage of the 1977 Act, the legislature considered, but rejected, an alternative bill that would have retained the State Engineer's temporary augmentation plan approval authority while adding additional notice provisions to cure the perceived procedural shortcomings of the statute. S.B. 5, 49th Gen. Assemb., Reg. Sess. (1970); *Empire Lodge*, 39 P.3d at 1152. The rejection of the alternate bill was at least partially motivated by concern over the potential overlap of administrative and adjudicative functions it would have created in the State Engineer.[14]

tion of a new sentence at the end of the statute which excludes from use in augmentation plans any water resulting from the eradication of phreatophytes, or from runoff created by rendering a previously permeable surface impermeable.

**11.** The augmentation plan decree identifies the structures, diversions, beneficial uses, amount of depletions to be replaced, the source of replacement water, and an explanation of how the augmentation plan will be operated. *Empire Lodge*, 39 P.3d at 1150–51.

**12.** In expectation of an overwhelming number of applications, the 1969 Act prohibited any new filings between July 1, 1971, and July 1, 1973, § 148–21–23(3) at 1212; this restriction was rescinded in 1971 when the anticipated rush did not materialize. *See* ch. 374, sec. 1, § 148–21–23(2), 1971 Colo. Sess. Laws 1334, 1334; *Empire Lodge*, 39 P.3d at 1151. Subsequent approval of augmentation plans was vested in the water ref-

eree, § 148–21–19 at 1208, but subject to judicial review. § 148–21–20 at 1208–11.

**13.** In *Kelly Ranch*, the conservancy district argued that the 1974 Act violated due process because it, provided inadequate notice of the State Engineer's actions and decisions to senior water users. This court did not reach the district's argument because it found that the appellant's application predated the 1974 Act, but noted that "[i]n the absence of intervening legislative amendment as to notice, we well may have to cross that bridge some future day." *Kelly Ranch*, 191 Colo. at 76, 550 P.2d at 305.

**14.** This intent is evident in the following excerpt from the Senate hearings:

I would recommend Senate Bill 4 [the enacted bill] as an improvement in the procedures which I think may have gotten the State Engineer more involved than he should be, ... perhaps from the standpoint that it is best that

Simultaneous with its repeal of the State Engineer's temporary augmentation plan approval authority, the legislature added two other significant statutory provisions indicating its clear intent to vest the water courts with augmentation plan approval authority. The first section provides, in part, that:

> Consistent with the decisions of the water judges establishing the basis for approval for plans for augmentation ... the state engineer and division engineers shall exercise the broadest latitude possible in the administration of waters under their jurisdiction to encourage and develop augmentation plans....

Ch. 111, sec. 1, § 148-21-23(7), 1974 Colo. Sess. Laws 440, 441 (emphasis added) (currently codified at § 37-92-501.5, 10 C.R.S. (2002)). The second significant statutory addition of the 1977 Act provided in relevant part as follows:

> In reviewing a proposed plan for augmentation and in considering terms and conditions which may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water which would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right....

Ch. 483, sec. 4, § 37-92-305(8), 1977 Colo. Sess. Laws 1702, 1703 (emphasis added) (currently codified at § 37-92-305(8), 10 C.R.S. (2002)).

### d. The 1996 Act

A lawsuit filed by the state of Kansas against Colorado claiming violations of the Arkansas River Compact, see Kansas v. Colorado, 514 U.S. 673, 115 S.Ct. 1733, 131 L.Ed.2d 759 (1995), prompted the General Assembly in 1996 to enact another statute adding provisions intended to strengthen the State Engineer's administrative enforcement powers. See ch. 7, secs. 1–7, 1996 Colo. Sess.

Laws 19, 19–24. Those provisions pertinent to the instant case included: (1) the imposition of fines against any water user who violated rules or regulations adopted by the State Engineer "to regulate or measure diversions of ground water" or any "plan approved pursuant" to such rules and regulations, id., § 37-92-503(6)(a) at 21 (emphasis added); and (2) the imposition of fines against any water user who, by violating an order or rules issued by the State Engineer "to replace depletions caused by diversions of ground water ... and whose failure to replace such depletions" caused the violation of an interstate compact, id., § 37-92-503(7) at 22 (emphasis added). These sections, particularly the highlighted portions, are relevant because the State Engineer cites them as proof of legislative intent to grant him the authority to approve the "replacement plans" at issue in the instant case. We address this argument infra in Section IV(A)(3)(d).

### e. The 2002 Act

In response to this court's holding in Empire Lodge and in order to "establish some additional authority for the state engineer to approve substitute water supply plans," section 37-92-308(1)(a), the General Assembly in 2002 enacted section 37-92-308, 10 C.R.S. (2002). To that end, the statute provides that "the state engineer is authorized to review and approve substitute water supply plans that allow out-of-priority diversions only under the circumstances and pursuant to the procedures set forth in this section." § 37-92-308(2). The statute then sets out four limited circumstances under which the State Engineer may grant temporary approval of substitute supply plans:

(1) If an applicant had a substitute supply plan approved prior to January 1, 2002, the State Engineer may approve one additional year of use. After that year, applicants are required to seek an augmentation plan decree from the water court. § 37-92-308(3).

---

he not have to wear too many hats, and if he's wearing the hat of a judge on a temporary plan for augmentation, then maybe it's some inconsistency there as compared with his entering an appearance before the water judge.

Hearing Before the Senate Committee on Agriculture, Natural Resources and Energy, 49th Gen. Assemb., Reg. Sess. (Colo.1977) (testimony of Sen. Fred Anderson).

(2) If an applicant has filed an application with the water court for approval of an augmentation plan upon which the court has not yet ruled, the State Engineer, after providing sufficient notice to other water users and making a finding of no injury, can temporarily approve the augmentation plan for up to one year. This approval is annually renewable for up to three years, with a showing of justifiable delay necessary for extensions beyond three years. § 37–92–308(4).

(3) If an applicant's use will not exceed five years, the State Engineer, after providing sufficient notice to other users and making a determination of no injury, may approve the plan annually for up to a total of five years. § 37–92–308(5).

(4) If the State Engineer determines that an emergency situation exists and has made a finding of no injury, he may grant temporary approval of a substitute supply plan for up to ninety days. § 37–92–308(7).

### 2. Conclusions Drawn From Legislative History

This review of legislative history convinces us of the General Assembly's intent to consign the matter of approving ongoing out-of-priority groundwater diversions using replacement water exclusively to the water courts. In 1969 and again in 1977 when it repealed the State Engineer's short-lived temporary augmentation plan approval authority, the General Assembly rejected the idea of granting the State Engineer such approval power due to concern over overlapping administrative and judicial authority and the inordinate amount of power this would have vested in the State Engineer. Even when the State Engineer was given temporary approval authority during the period between 1974 and 1977, that approval was conditioned upon the water user having

filed an augmentation plan application in water court. Those bills which were enacted into law in 1969 and 1977 evidence a steadfast legislative intent to make augmentation plan approval an adjudicatory function of the water courts as opposed to an administrative task of the State Engineer. *See Empire Lodge,* 39 P.3d at 1153.

Any lingering doubt as to this intent was conclusively put to rest with the enactment in 2002 of section 37–92–308, 10 C.R.S. (2002), which unambiguously provides that it is the province of the water courts to approve and decree augmentation plans, except in the four limited circumstances set out in subsections (3), (4), (5), and (7) of the statute, which allow the State Engineer to grant temporary substitute supply plan approval pursuant to the express provisions of those subsections.[15]

### 3. Appellants' Arguments

The State Engineer and the Groundwater Appropriators of the South Platte River Basin, Inc. ("GASP")[16] contend, however, that the legislative intent is not as clear-cut as our overview would indicate. They point to several specific statutory directives which they argue confer upon the State Engineer the authority to make rules approving temporary "replacement plans" as provided for in the 2002 proposed rules. We turn now to an examination of these arguments.

### a. The State Engineer's Curtailment Authority

■ The State Engineer's first argument proceeds as follows. The water rule power allows him to make rules and regulations to assist him in the performance of his duties. § 37–92–501. One of those duties is to curtail out-of-priority diversions that are injurious to senior rights, unless no material injury will result because curtailment will not result

---

**15.** At the time this opinion was released, S.B. 03-73, 64th Gen. Assemb., Reg. Sess. (Colo. 2003), had not been enacted and was accordingly not taken into consideration in rendering this opinion.

**16.** GASP is a non-profit corporation comprised of well-owners in the South Platte River Basin. The members work cooperatively to purchase augmentation water that members can use to replace their out-of-priority groundwater deple-

tions and thereby avoid curtailment. Prior to this court's decision in *Empire Lodge,* 39 P.3d 1139, GASP replacement water was administered in accordance with substitute water supply plans approved by the State Engineer pursuant to section 37–80–120. *Empire Lodge,* however, clearly established that such ongoing approval of substitute supply plans by the State Engineer was outside his authority. 39 P.3d at 1153.

or has not resulted in sufficient water reaching the senior at the time and place of his need. If such a showing of no material injury is made, then the State Engineer must allow the out-of-priority diversion to continue unabated or to resume if it was previously curtailed. §§ 37–92–501(1) and 37–92–502(2)(a), 10 C.R.S. (2002). The State Engineer further contends, although with no statutory support, that in order for him to make his determination as to whether or not a well diversion impairs a senior water right and must be curtailed, he has the implicit authority to analyze whether the well user has sufficient, legally-available replacement water to make up the shortfall. If he determines that the well user does have such replacement water available, then the State Engineer argues that he has no option but to approve a "replacement plan" that allows the well diversion to continue on an annual basis. This approval, in turn, provides assurance to the well user that his diversion will not be curtailed during the coming year.

The water court rejected this argument, finding that (1) the statute made no reference to replacement water, but only to the water that discontinuance of the out-of-priority diversion would make available; and (2) the factors listed in section 37–92–502(2)(a) [17] upon which the State Engineer is to base his materiality of injury determination do not include an analysis of the adequacy of replacement water.

We agree with the water court. The State Engineer's material injury analysis is limited to a determination, based on consideration of the factors expressly listed in the statute, of whether curtailment of an out-of-priority use will make water available to fulfill senior priorities at the time and place of need.

The State Engineer further contends, however, that section 37–92–501.5 expands his authority by requiring him to curtail out-of-priority diversions, "the depletions from which are not so replaced as to prevent injury to vested water rights." This argument is conclusively dispelled by the prefatory clause of that statute: "*Consistent with the decisions of the water judges* establishing the basis for approval for plans of augmentation and for the administration of ground water,...." § 37–92–501.5, 10 C.R.S. (2002) (emphasis added). Therefore, contrary to the State Engineer's argument, the statute is fully consistent with the recurring legislative intent to consign approval of out-of-priority diversions and the replacement water used in augmentation plans to the discretion of the water courts.

**b. The "Broadest Latitude Possible" Language of Section 37–92–501.5, 10 C.R.S. (2002)**

The State Engineer next contends that augmentation plans are but one means contemplated by the legislature to encourage conjunctive use and ensure maximum utilization of the waters of the state; therefore, he reasons, "replacement plans" are likewise acceptable. The statutory language upon which the State Engineer premises his argument provides as follows:

... the state engineer and division engineers shall exercise *the broadest latitude possible* in the administration of waters under their jurisdiction to *encourage and develop augmentation plans* and voluntary exchanges of water and may make such rules and regulations and *shall take such other reasonable action* as may be necessary in order *to allow continuance of existing uses* and to assure maximum beneficial utilization of the waters of this state.

§ 37–92–501.5, 10 C.R.S. (2002) (emphases added). Based on this language, the State Engineer contends that the phrase "other reasonable action ... to allow continuance of existing uses" means that he is free to use methods other than decreed augmentation

---

**17.** That section provides, in part, as follows:

The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need. Such factors include the current and prospective volumes of water in and tributary to the stream from which the diversion is being made; distance and type of stream bed between the diversion points; the various velocities of this water, both surface and underground; the probable duration of the available flow; and the predictable return flow to the affected stream.

§ 37–92–502(2)(a), 10 C.R.S. (2002).

plans by which to administer pre 1969 wells, such as the approval of temporary "replacement plans." Thus, the State Engineer argues that his use of "replacement plans" is "reasonable action" under his "broad[ ] authority" to "encourage and develop augmentation plans."

We disagree. First, we interpret the statutory command that the State Engineer "encourage and develop augmentation plans" to mean not that he may approve such plans, but that he is to assist water users in developing and making applications for augmentation plans to the courts. Second, irrespective of the State Engineer's interpretation of the statutory language, the fact remains that the proposed 2002 rules provide for temporary augmentation plans, which are in turn subject to (1) ultimate water court approval pursuant to section 37–92–501.5, (2) the statutory restrictions set forth in section 37–92–308, and (3) the legislative intent made manifest in the 1974 enactment that temporary augmentation plan approval by the State Engineer be contingent upon application having been first made to the water court.

c. **The Reference to River Basin or Aquifer Rules in Section 37–92–308, 10 C.R.S. (2002)**

The State Engineer and GASP argue in the alternative that even if the General Assembly, by enacting section 37–92–308, intended approval of out-of-priority well diversions requiring an augmentation plan to be the exclusive province of the water court, the General Assembly made an express exception in that statute for rules applicable to an entire river basin or aquifer. The portions of section 37–92–308 that appellants rely on provide as follows:

(1)(c) Prior to January 1, 2002, the general assembly gave the state engineer administrative authority to regulate wells upon promulgation of rules for a river basin or aquifer, subject to the review of the water judge as provided in section 37–92–501(3); and *nothing in this section shall be construed to modify such authority.* § 37–92–308(1)(c) (emphasis added).

(2) *In addition to the authority previously granted to the state engineer,* listed in subsection (1) of this section, the state engineer is authorized to review and approve substitute water supply plans that allow out-of-priority diversions only under the circumstances and pursuant to the procedures set forth in this section. § 37–92–308(2) (emphasis added).

The appellants interpret these subsections as expressly exempting river basin rules from the constraints subsequently imposed by subsections 37–92–308(3), (4), (5), and (7), which set forth the four discrete circumstances under which the State Engineer can approve temporary augmentation plans.

Were we to restrict our analysis solely to the four corners of subsections 37–92–308(1)(c) and (2), appellants' argument might be persuasive; a contextual review, however, compels the opposite conclusion. The "previous authority" of the State Engineer referred to in these subsections is set forth in section 37–92–501, 10 C.R.S. (2002), which establishes the State Engineer's water rule power, including his authority to promulgate rules for a river basin. The water rule power is itself subject to judicial review. § 37–92–501(3). In addition, section 37–92–501(2) requires that "[i]n the adoption of such rules and regulations the state engineer shall be guided by the principles set forth in section 37–92–502(2)." Section 37–92–502(2), in turn, requires, *inter alia,* that "[e]ach diversion shall be evaluated and administered ... in accordance with ... the court decrees adjudicating and confirming water rights."

When the statutes are viewed comprehensively, it is evident that the "previous authority" granted the State Engineer to promulgate river basin rules is itself subject to other statutory provisions requiring water court approval of out-of-priority diversions. Accordingly, to give effect, as we must, to the entire statutory scheme, we cannot arrive at the same interpretation of sections 37–92–308(1)(c) and (2) that appellants do.

In addition, both the content of the legislative hearings and the policy statement contained in subsection (1)(a) demonstrate that the enactment of section 37–92–308 was intended to effect a compromise between the necessity for a court decree sanctioning out-

of-priority uses, and the need to operate substitute supply plans or "replacement plans" on a short-term basis during the pendency of the adjudicatory process. As Representative Diane Hoppe, sponsor of the legislation explained:

> H.B. 1414 represents the middle ground here. It represents a set of compromises that achieves a fair and balanced approach to substitute supply plans that will meet the need for prompt review for certain water uses, without creating a substitute for water supply [sic] court adjudication, adjudication of new augmentation plans.

*Second Reading of H.B. 02–1414,* 63rd Gen. Assemb., Reg. Sess. (Colo.2002) (statement of Rep. Diane Hoppe). In view of this clearly articulated reason for enacting section 37–92–308 and our interpretation of that statute's interrelation with the entire statutory scheme, appellants' argument that river basin rules were intended to be exempt from the statute's restrictions is simply untenable.[18]

### d. The 1996 Legislation

■ GASP contends that the following paraphrased provisions in the 1996 Act demonstrate legislative intent to allow the continued use of groundwater in accordance with "replacement plans" approved pursuant to State Engineer rules and regulations.

> (1) The imposition of fines against any water user who violates rules or regulations adopted by the State Engineer "to regulate or measure diversions of ground water" or any *"plan approved pursuant"* to such rules and regulations. Ch. 7, sec. 5, § 37–92–503(6)(a), 1996 Colo. Sess. Laws 19, 21 (emphasis added).

**18.** Although we recognized in *Empire Lodge* that the State Engineer has authority to regulate wells upon promulgation of rules for a river basin or aquifer, subject to water court review under section 37–92–501, 39 P.3d at 1153, n. 17, we did not mean to imply by this that the State Engineer's enforcement discretion or rulemaking authority could preempt the clear legislative policy in favor of priority administration and court approval of augmentation plans.

**19.** That section provides in part as follows:

> (2) The imposition of fines against any water user who, by violating an order or rules issued by the State Engineer *"to replace depletions caused by diversions of ground water … and whose failure to replace such depletions"* caused the violation of an interstate compact. Ch. 7, sec. 5, § 37–92–503(7), 1996 Colo. Sess. Laws 19, 22 (emphasis added).

We disagree. In light of the repeated demonstration of legislative intent to vest augmentation plan approval in the courts, we interpret the allusions in the 1996 Act to a "plan" and the necessity "to replace depletions" as instead referring to the State Engineer's administration and enforcement authority over extant, decreed augmentation plans pursuant to section 37–92–502(4).[19] Moreover, an ambiguous reference in the 1996 Act to "plans" approved by the State Engineer is simply insufficient to render some twenty-five years of legislative history, repeatedly demonstrating the intent to vest augmentation plan approval authority in the courts, inapplicable. Certainly, had the General Assembly intended such a departure from previous law, it knew how to make that intent express. *See, e.g.,* § 37–90–137(11) (allowing the State Engineer to approve augmentation plans in connection with sand and gravel operations); § 37–80–120 (allowing the State Engineer to permit out-of-priority reservoir storage providing the water is made available to satisfy a senior call).

### e. The Arkansas River Rules

The Arkansas River basin rules were approved by the water court in Water Division 2 in 1996 and were not appealed. The State Engineer and GASP argue that these rules allow for the use of "plans" that are virtually identical to the "replacement plans" proposed in the 2002 South Platte River rules.[20] From

> Each division engineer with the approval of the state engineer shall administer the movement of water involved in any plan for augmentation or water use project which is in effect in his division. If any such plan or project involves the movement of water from one division to another, then the administration of such movement shall be the direct responsibility of the state engineer….
>
> § 37–92–502(4), 10 C.R.S. (2002).

**20.** The Arkansas River rules provide, in pertinent part, that the State Engineer can curtail injurious

this, and the fact that the 1996 Act referencing "plans" was passed shortly before the promulgation of the Arkansas River rules, appellants conclude that the General Assembly implicitly approved of the use of "replacement plans" by the State Engineer.

■ We find this argument unpersuasive. First, rules and regulations pertaining to one water basin are inapplicable to others:

> In the adoption of ... rules and regulations the state engineer shall be guided ... by the following:
>
> (a) Recognition that each water basin is a separate entity, that aquifers are geologic entities and different aquifers possess different hydraulic characteristics even though such aquifers be on the same river in the same division, and that rules applicable to one type of aquifer need not apply to another type.

§§ 37–92–501(2) and (2)(a), 10 C.R.S. (2002). Second, the validity of the Arkansas River Basin rules is clearly not before us. To the contrary, no party appealed those rules, and all parties now agree they are in force and should not be affected by any opinion in this case.

### 4. The Limits of the State Engineer's Authority Pursuant to the Water Rule Power

■ Our analysis of the State Engineer's administrative authority with regard to the water rule power convinces us that the General Assembly intended exercise of that power to be conducted within certain defined boundaries. Specifically, the legislature intended that any plan implemented by out-of-priority water users to replace depletions injurious to senior water rights must be subject to water court approval. The General Assembly provided for four specific exceptions to this rule, which are explicitly set out in sections 37–92–308(3), (4), (5), and (7), 10 C.R.S. (2002). Notably, subsection (4) allows

out-of-priority groundwater depletions unless the water is replaced by (1) a decreed augmentation plan, (2) a substitute supply plan approved by the State Engineer pursuant to section 37–80–120, or (3) "a plan approved by the state and division engineers in accordance with these Rules." Rule 6 grants the State Engineer authority to "determine the adequacy of each source of water pro-

the State Engineer to approve temporary substitute supply plans on an annual basis, similarly to the proposed rules, but *contingent upon* application having been made to the water court for plan approval. § 37–92–308(4)(a), 10 C.R.S. (2002).

We find appellants' arguments positing State Engineer powers in excess of these restrictions unavailing. Sections 37–92–501(1), 37–92–501.5, and 37–92–502(2)(a), read in tandem, indicate that the State Engineer's curtailment duty, limited by the materiality of injury analysis, is solely an administrative task which is constrained by the adjudicatory authority of the water court to sanction out-of-priority diversions of groundwater. In addition, our review of the 2002 Act reveals no legislative intent to make rules promulgated for a river basin an exception to these statutory restrictions. Finally, we find no language in the 1996 Act to the contrary, nor do we find that the Arkansas River rules provide any persuasive effect otherwise.

We therefore affirm the trial court by holding that to the extent the proposed 2002 South Platte River rules allow the State Engineer to authorize out-of-priority diversions requiring "replacement plans" in the absence of an augmentation plan application pending in water court, or pursuant to the requirements of section 37–92–308, the rules are in excess of the State Engineer's statutory authority and contrary to law.

### B. State Engineer's Compact Rule Power with Regard to Colorado's Obligations to Nebraska under the South Platte River Compact

As an additional basis for his authority to approve "replacement plans," the State Engineer asserts his compact rule power under section 37–80–104, 10 C.R.S. (2002), and his administrative authority to ensure compli-

posed for use as augmentation water." Rule 7 provides that the State Engineer "may approve a plan to divert tributary ground water which provides sufficient augmentation water in amount, time, and location," and that the plan must be reviewed annually by the State Engineer to ensure that it does not cause injury to seniors.

ance with the South Platte River Compact under section 37–65–101, Art. VIII, 10 C.R.S. (2002). The compact rule power allows the State Engineer to make regulations as necessary to ensure Colorado's compliance with its interstate water compacts, but only in those instances where the compact itself is deficient in establishing terms for compliance within Colorado. Section 37–65–101, Art. VIII, is specific to the South Platte River Compact, and allows the State Engineer to ensure delivery of a specified amount of water to Nebraska "without necessity of enactment of special statutes for such purposes by the General Assembly of the State of Colorado."

### 1. Delivery Requirements of the Compact

In 1923, the State of Colorado and the State of Nebraska entered into the South Platte River Compact in order to forestall future conflict between the states and memorialize their understanding regarding their respective usages of the South Platte River. § 37–65–101 (preamble), 10 C.R.S. (2002).

Pursuant to Article IV of the compact, between the fifteenth day of October and the first day of April of each year, Colorado has the unimpeded use of all waters of the South Platte River flowing within the state. § 37–65–101, Art. IV(1). Between the first day of April and the fifteenth day of October, however, water officials in Colorado may not allow those water users in the lower section of the river [21] whose appropriation dates are more recent than June 14, 1897, to divert water to the extent that those diversions will lower the flow of the river to less than a mean daily flow of 120 cubic feet per second ("cfs") where it flows through the Interstate Station at the boundary line between the states. § 37–65–101, Art. IV(2).

21. The "lower section" of the river is defined as "that part of the South Platte River in the State of Colorado between the west boundary of Washington County and the intersection of said river with the boundary line common to the signatory States." § 37–65–101, Art. I(4), 10 C.R.S. (2002).

22. We are not unsympathetic to this burden. Indeed, this state has been made to recognize on more than one occasion that adherence to compact requirements is a matter of the utmost grav-

### 2. Role of the State Engineer in Enforcing the Compact

The terms of the South Platte River Compact impose on the State Engineer the unmitigated duty to "make deliveries of water at the Interstate Station in compliance with this compact without necessity of enactment of special statutes for such purposes by the General Assembly of the State of Colorado." § 37–65–101, Art. VIII. In addition to the State Engineer's enforcement power pursuant to the compact itself, section 37–80–104, 10 C.R.S. (2002), more broadly outlines the State Engineer's duties to ensure compliance with all of Colorado's interstate river compacts. This statute is the source of the State Engineer's compact rule power and provides as follows:

> The state engineer shall make and enforce such regulations with respect to deliveries of water as will enable the state of Colorado to meet its compact commitments. In those cases where the compact is deficient in establishing standards for administration within Colorado to provide for meeting its terms, the state engineer shall make such regulations as will be legal and equitable to regulate distribution among the appropriators within Colorado obligated to curtail diversions to meet compact commitments, so as to restore lawful use conditions as they were before the effective date of the compact insofar as possible.

§ 37–80–104, 10 C.R.S. (2002).

While these statutory provisions clearly vest the State Engineer with significant power to administer water use within the state, they also place a considerable onus on the State Engineer to ensure compliance with Colorado's interstate obligations to Nebraska. [22]

ity. See, e.g., Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938) (individual state water users are bound by compact requirements even where their water rights precede execution of the compact); Kansas v. Colorado, 533 U.S. 1, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001) (Colorado found liable for violating its delivery requirement to Kansas under terms of Arkansas River Compact).

It is the State Engineer, as the chief state water administrative official, who must make the necessary administrative decisions regarding the necessity, timing, amount, and location of intrastate water restrictions in order to ensure that Colorado's critical interstate delivery obligations are fulfilled. *Alamosa–La Jara Water Users Prot. Ass'n v. Gould,* 674 P.2d 914, 923 (Colo.1983). Given an irreconcilable conflict between intrastate priority administration and compliance with an interstate compact, it is compact compliance that must take precedence. *See id.* ("In an equitable apportionment, strict adherence to prior appropriations may not always be possible."); Corbridge & Rice, *supra,* at 190 ("If interstate allocation is subordinate to individual rights, interstate compacts would be valueless.").

This court has nevertheless recognized that the State Engineer, while enforcing compact delivery requirements, must simultaneously adhere, insofar as possible, to Colorado constitutional and statutory provisions for priority administration. *People ex rel. Simpson v. Highland Irrigation Co.,* 917 P.2d 1242, 1248 (Colo.1996). Thus, although the compact rule power is broad in its scope, it still must be exercised to the extent possible within the existing framework of Colorado statutory priority law.

With this understanding of the State Engineer's role in compact administration in mind, we now proceed to our analysis of the use of the State Engineer's compact rule power in this case.

### 3. State Engineer's Authority to Promulgate the Proposed Rules to Ensure Compliance with the Terms of the South Platte River Compact

The State Engineer and GASP argue that the water court erred when it held that the South Platte River Compact was not deficient in establishing standards for administration within Colorado because the compact could be administered as an 1897 priority, and therefore the State Engineer's compact rule power under section 37–80–104 was not implicated. For the reasons discussed below, we agree and now reverse this portion of the water court's ruling.

Section 37–80–104 provides that the State Engineer shall only make regulations to ensure interstate compact compliance when the compact itself is "deficient in establishing standards for administration within Colorado to provide for meeting its terms. . . ." The water court reasoned that the South Platte River Compact was not so deficient because Article IV allows for the State Engineer to ensure compliance by curtailing any diversions in the lower section of the river having priority dates junior to June 14, 1897, to the extent necessary to meet the delivery requirements of the compact.

The State Engineer and GASP contend that intrastate curtailment according to priority date is insufficient. They argue that when the compact was ratified in 1923, its drafters could not have anticipated the huge increase in the number of wells and the concomitant groundwater pumping that has occurred since that time. Not only do these groundwater depletions place an enormous demand on priority administration within the state, they also greatly complicate compact compliance because they cause a delayed impact on the flow of the river.[23] As a result, curtailing groundwater depletions by priority date alone may not result in increased flows at the state line at the time they are needed. Thus, appellants argue that the provisions of the compact are deficient in establishing standards for administration and the compact rule power is therefore implicated. We agree.

The South Platte River Compact was signed on April 27, 1923, and subsequently approved by the Colorado General Assembly. § 37–65–101, 10 C.R.S. (2002). As discussed, Article IV, section 2 of the compact requires the State Engineer to curtail diversions in the lower section of the river with priority dates junior to June 14, 1897, to the extent necessary to ensure a mean daily flow of 120

---

**23.** This delayed impact is often termed "lag effect" and results from the fact that, depending on several factors, including how far away the well is from the river, it can take a considerable amount of time before the increased water made available from the curtailment of groundwater depletions returns to the river and actually increases its flow.

cfs at the state line. In 1923, however, there existed only a handful of wells in the South Platte River basin. MacDonnell, *supra*, at 585. Accordingly, Article IV, section 2, of the compact could only have contemplated that it would be surface rights which would need to be curtailed in order to ensure adequate delivery.

Improvements in technology and increasingly affordable electricity, along with droughts in the 1930s and 1950s, however, lent significant impetus to the development of wells in the post-compact era. In 1933, there were approximately 250 wells in the basin; by 1970, approximately 3,200. *Id.* Today, the State Engineer estimates there are around 4,000 wells in the South Platte River Basin, some 3,000 of which are owned by members of GASP. This exponential growth in groundwater use has had a twofold impact on the surface flow of the South Platte River, and a concomitant effect on the administration of the South Platte River Compact.

First, increased pumping has reduced the surface flows of the river. The South Platte River basin is underlain by a permeable alluvial layer which was historically saturated by seepage from the river and return flows from irrigation. *Id.* at 582. As high-volume agricultural wells pump out this alluvial water, however, the surface flow of the river is eventually depleted, either because there is a reduction in the groundwater flow to the river or because the resultant vacuum causes surface water to flow back into the aquifer. *Id.* at 581.

Second, the lag effect caused by groundwater pumping makes estimation of when surface flows will arrive at the state line considerably more difficult. While it is clear that unreplaced groundwater depletions eventually reduce the surface flows of the river, when and by how much this reduction actually occurs depends upon a multitude of factors, including: (a) the distance of the well from the stream, (b) transmissibility of the aquifer, (c) depth of the well, (d) time and volume of pumping, and (e) return flow characteristics. *Fellhauer v. People*, 167 Colo. 320, 332, 447 P.2d 986, 992 (1968). As a result, it is an extremely complex matter to determine when and to what extent curtailment or augmentation must occur to ensure adequate delivery at the state line. Neither the impact of groundwater depletions nor the resultant lag effects, however, were a concern when Article IV of the compact was written.

Consideration of these factors convinces us that compliance with the terms of the South Platte River Compact requires additional intrastate water administration beyond the simple priority administration provided for in Article IV of the compact. We conclude that the South Platte River Compact is "deficient in establishing standards for administration within Colorado to provide for meeting its terms." § 37–80–104, 10 C.R.S. (2002). We therefore hold that the State Engineer is justified in promulgating rules and regulations for the South Platte River basin pursuant to his compact rule power. We accordingly reverse that portion of the water court's order which found the South Platte River Compact self-executing and administrable solely as an 1897 priority.

There are, however, no specific procedures set forth in the compact itself or in section 37–80–104 for compact rulemaking. As a result, this court has held that in order to promulgate and enforce rules under his compact rule power, the State Engineer must necessarily do so pursuant to his water rule power:

> It is crystal clear that, in order to promulgate and enforce rules for compliance with Compact commitments, the State Engineer must promulgate and enforce appropriate rules for the administration of water rights. The latter rules must of necessity be under the authority of the 'water rule power.' Any achievement under the 'compact rule power' will be dependent upon and inextricably commingled with rules under the 'water rule power.'"

*Kuiper v. Gould*, 196 Colo. 197, 202, 583 P.2d 910, 913 (1978). Therefore, although the State Engineer can make rules to enforce compact compliance in those instances where the compact itself is deficient in establishing standards, the means by which he does so are both dictated and constrained by other statutory requirements. Indeed, statutory

directives do not exist in a vacuum; instead, statutes—and the authority they convey—are as interrelated to one another as the legislative objectives that motivated their enactment. "A statute must . . . be construed to further the legislative intent evidenced by the entire statutory scheme." *Martinez v. Continental Enters.*, 730 P.2d 308, 315 (Colo. 1986).

We therefore hold that the State Engineer may promulgate rules pursuant to his compact rule power in section 37–80–104 with respect to the South Platte River Compact. In doing so, however, the State Engineer is constrained by all of the statutory restrictions imposed on his water rule power, including the provisions set forth in section 37–92–308.

## C. Rules Cannot Become Effective Until All Protests are Heard and Resolved by the Water Court

 The State Engineer argues that the water court erred by concluding that all protests to the proposed 2002 rules must be heard and resolved before the rules can take effect. To the extent that we have affirmed the trial court's holding that the 2002 proposed rules are void, this argument is moot. There are, however, two exceptions to the mootness doctrine: (1) the matter involves a question of great public importance, or (2) the issue is capable of repetition, yet evades review. *Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n*, 14 P.3d 325, 345 (Colo.2000). Appellees urge us to rule on the matter based on the latter exception to the mootness doctrine, citing three prior rulemaking cases in which the trial court struck down the State Engineer's argument that rules could take effect prior to the resolution of all protests. Because none of those judgments was appealed, and the matter may evade appellate review yet again in the instant case, appellees urge us to make a definitive holding on the issue. We agree, and proceed now to entertain the arguments presented in this case and render a ruling.

In arguing that the proposed 2002 rules can take effect prior to the final disposition of protests, the State Engineer first refer-

ences the language of section 37–92–501(2)(g) which provides, in pertinent part:

> That *time being of the essence*, rules and regulations and changes thereof proposed for an aquifer shall be published once in the county or counties where such aquifer exists not less than *sixty days prior to the proposed adoption of such rules and regulations*, and copies shall be mailed by the water clerk of the division to all persons who are on the mailing list of such division.

The State Engineer asserts that not only is the sixty-day publication requirement the only statutory prerequisite to the adoption of rules, but that the statute expressly mandates that time is of the essence. Accordingly, he and GASP urge us to allow the adoption of rules pursuant to the sixty-day publication requirement, regardless of whether protests are filed, subject to the power of the water court to issue a preliminary injunction to stay the effective date of the proposed rules when the prerequisites to such a stay are established.

 We reject the State Engineer's reasoning. It is a well-settled principle of administrative law that a legislative delegation of power to an administrative agency is valid only if the legislative body has provided both sufficient standards to guide the agency's exercise of that power, and adequate procedural safeguards to protect against the unreasonable abuse of that power. *See Cottrell v. City & County of Denver*, 636 P.2d 703, 709 (Colo.1981); *Elizondo v. Dept. of Revenue*, 194 Colo. 113, 116–17, 570 P.2d 518, 520–21 (1977). The legislature often provides by statute for notice, comment, and hearing procedures as a means by which to safeguard individual rights. *AviComm, Inc. v. Colo. Pub. Util. Comm'n*, 955 P.2d 1023, 1030 (Colo.1998); *see also* State Administrative Procedure Act (APA) at § 24–4–103, 7B C.R.S. (2002). With regard to water rulemaking by the State Engineer, the General Assembly has specifically provided such procedures pursuant to sections 37–92–501(2)(g), 37–92–501(3)(a) and (b), and 37–92–304, 10 C.R.S. (2002). Although the State Engineer has complied with the sixty-day publication and notice provisions of section 37–92–501(g) in promulgating the 2002 proposed rules, his

argument that this compliance alone is sufficient is belied by the additional procedural processes set forth in section 37–92–501(3). That section provides that:

Any person desiring to protest a proposed rule and regulation may do so in the same manner as provided in section 37–92–304 for the protest of a ruling of a referee, and the water judge shall hear and dispose of the same as promptly as possible.

§ 37–92–501(3)(a), 10 C.R.S. (2002). Section 37–92–304, in turn, sets forth the procedural requirements by which the water judge is to hear and resolve protested matters, including conducting a de novo hearing in which affected parties have a right to be heard, and issuing a decision either confirming, modifying, reversing, or reversing and remanding the contested ruling. §§ 37–92–304(3) and (5), 10 C.R.S. (2002).

Although the State Engineer is technically correct that neither statute expressly mandates that all protests must be heard and resolved before rules can be adopted, the direct reference in section 37–92–501(3) to the adjudicatory procedures set forth in section 37–92–304 nevertheless evidences a clear intent toward this result. Moreover, precisely because section 37–92–501(2)(g) provides no opportunity for affected water users to comment upon the rules prior to their adoption by the State Engineer, the hearing procedures set forth in section 37–92–304 provide the only meaningful opportunity for interested parties to protest potential infringements on their water rights created by the rules. We interpret the procedures set forth in section 37–92–304 as the means chosen by the legislature to provide safeguards against the unreasonable exercise of administrative discretion by the State Engineer.

The State Engineer also argues that the potentially lengthy process necessary for a judicial resolution and disposition of protests in this matter could, in the interim, jeopardize his ability to enforce the South Platte River Compact. In response, we reiterate our earlier conclusion that the State Engineer, while enforcing compact delivery requirements, must simultaneously adhere, insofar as possible, to Colorado statutory requirements. As previously discussed, the General Assembly has set out specific procedural requirements which the State Engineer must adhere to in exercising his rule-making powers. We have held that the promulgation of river basin rules do not provide an exception to these requirements. The issue of what procedure the State Engineer must follow if faced with an irreconcilable conflict between enforcing the South Platte River Compact and adhering to these procedural requirements is not before us and we decline to address it further.

We affirm the ruling of the water court that if protests are filed with respect to rules and regulations proposed by the State Engineer pursuant to section 37–92–501, the effective date of such rules and regulations must be stayed until all such protests are judicially resolved pursuant to the procedures set forth in section 37–92–304.

## V. CONCLUSION

We affirm the trial court's ruling voiding the proposed 2002 South Platte River basin rules to the extent those rules provide for State Engineer approval of "replacement plans" allowing the out-of-priority diversion of groundwater in the absence of any provision requiring that an application for an augmentation plan be filed with the water court. We hold that the State Engineer can only grant temporary approval of augmentation plans pursuant to the four narrowly circumscribed situations set forth in sections 37–92–308(3), (4), (5), and (7), 10 C.R.S. (2002).

We reverse the trial court's ruling that the State Engineer is without authority to promulgate rules to enforce the terms of the South Platte River Compact pursuant to section 37–80–104. We disagree with the trial court's conclusion that the compact is self-executing, holding instead that due to increased well pumping and the advent of maximum utilization of the waters of the state, simple priority administration as provided for in the compact is insufficient to ensure compact compliance. In exercising his compact rule power, however, the State Engineer is constrained by all statutory restrictions imposed on his water rule power, including those set forth in section 37–92–308, 10 C.R.S. (2002).

Finally, we affirm the trial court's holding that State Engineer promulgated rules and regulations may not take effect until protests have been judicially heard and resolved pursuant to the procedures provided in sections 37–92–501(3) and 37–92–304, 10 C.R.S. (2002). We therefore remand this case to the trial court [24] for further proceedings consistent with this opinion.

---

24. We remand with orders for the trial court to employ the standard of review this court articu- lated in *Matter of Arkansas River,* 195 Colo. 557, 563, 581 P.2d 293, 297 (1978).