27 P. 235 
1 Colo.App. 49
 ARMSTRONG, Water Commissioner, v. LARIMER COUNTY DITCH CO. 
Court of Appeals of Colorado
July 7, 1891

 
 Error
 to district court, Larimer county; T.M. ROBINSON, Judge.
 
 
 The
 right to the use of water secured by legal appropriation is
 property, and a proper construction of the various provisions
 of the constitution on the subject harmonizes that instrument
 with the declaration of the Bill of Rights, "that
 private property shall not be taken or damaged for public or
 private use without just compensation."
 
 
 Defendant
 in error is a corporation operating under the general
 incorporation law of the state for constructing, operating,
 and maintaining a ditch for irrigation, agriculture,
 domestic, and manufacturing purposes. In April, 1881, it
 commenced the construction of its ditch from the Cache la
 Poudre river, at a point near the foot of the mountains, to
 run in an easterly and south-easterly direction. There were
 also seven contemplated or projected reservoirs for the
 storage of water. The ditch was in process of construction
 for several years, and some time during the year 1888 was 60
 miles in length, having at its head a carrying capacity of [1
 Colo.App. 50] about 470 cubic feet of water per second. At
 the time of the institution of this suit very few, if any, of
 the contemplated reservoirs along the line of the ditch for
 storing the supply of water had been built. By an
 adjudication in April, 1882, to establish the priorities to
 the use of water in the district where the ditch was located,
 in which a decree was entered, and by subsequent and
 supplemental proceedings, one in April, 1884, and one in
 October, 1885, in which the decree was amended, it was
 finally adjudicated and decreed that the ditch of the
 defendant in error should be ditch No. 63, with priority No.
 100, with capacity computed at 463 cubic feet per second.
 Between the time of the commencement of the construction of
 the ditch and the bringing of this suit a large number of
 settlers, estimated at near 200, many with families, settled
 under the ditch, dependent upon the defendant for water for
 irrigating and domestic purposes to be supplied from its
 ditch under contracts made with the corporation. It is shown
 in evidence that the large extent of country through which
 the ditch was excavated was an arid, alkaline waste,--a
 veritable desert. Before the supposed appropriation of water
 to the ditch in question there had been from the Cache la
 Poudre river 99 appropriations of water, dating from the
 earliest settlement of the country down to that time, and
 each and all had been decreed priority over the ditch in
 question. Priorities from 1 to 78 inclusive were for water
 appropriated prior to January 1, 1876, and aggregated over
 2,300 cubic feet of water per second. On the 4th day of May,
 1888, as shown by the evidence, there was but 360 cubic feet
 of water per second in the river. From that time on to the
 close of the irrigating season, with the exception of two
 short freshets, lasting but a few hours, the water varied
 from 250 to 800 cubic feet per second. The plaintiff in
 error, during the year 1888, was water commissioner of the
 district in which defendant's ditch was situated, and, in
 his official capacity, charged with the apportionment and
 distribution of water according to the appropriations [1
 Colo.App. 51] and priorities, as adjudicated and decreed.
 Early in the season, by reason of the scarcity of water in
 the stream, and its inadequacy to supply earlier
 appropriations, he ordered the head-gates of defendant's
 ditch closed, and the water was shut out.
 
 
 This
 suit was instituted against the water commissioner, plaintiff
 in error, by filing a complaint on the 4th day of May, 1888,
 for an injunction restraining him from closing the ditch, and
 for a decree that the ditch be entitled to water sufficient
 for the domestic use of those who were alleged to be
 dependent upon it. On the day the complaint was filed the
 following order was made: "Upon the filing of this
 complaint in the office of the clerk of the district court of
 Larimer county, Colorado, and also upon the filing of an
 undertaking in the sum of one thousand dollars, conditioned
 as required by law, with good and sufficient sureties, to be
 approved by the clerk, that a writ of injunction issue
 commanding the defendant, his associates and employes,
 immediately to raise the head-gate of the ditch or canal
 mentioned in the complaint, so that a sufficient amount of
 water may enter and flow into said ditch to supply the
 consumers of water therefrom with water for domestic
 purposes, according to its priority
 [27 P. 236] 
 No. 100, as heretofore determined by the decree of the court,
 and also commanding him and them to keep said head-gate
 raised until further order in the premises. Allowed at Fort
 Collins this 4th day of May, 1888,"--and a preliminary
 writ of injunction was issued and served. A trial was had,
 and, on November 5th, the following final decree was entered:
 "This cause having heretofore come on to be finally
 heard upon the pleadings and the evidence, as well that on
 part of the defendant as that in behalf of the plaintiff, and
 the court having heard the same and the argument of counsel
 thereon, and having taken the matter under consideration for
 further advisement, and having duly considered the same, and
 being now fully advised in the premises, doth find the issues
 for the plaintiff. And the court doth specially find from the
 pleadings and evidence aforesaid that, [1 Colo.App. 52] at
 the time of the commencement of this action, the plaintiff
 was, and still is, a corporation duly organized for, and,
 among other things, engaged in, the business of conveying and
 distributing from the Cache la Poudre river, to and for the
 use of persons residing along the line of its canal, water
 for domestic purposes; that the plaintiff's said canal is
 situate in water district No. 3, and is some sixty miles in
 length; that the persons aforesaid residing along the line of
 said canal, at the time of the commencement of this action,
 were and still are, to a great measure, dependent upon the
 plaintiff and its said canal for water suitable and fit for
 domestic purposes, and, in many instances, are wholly
 dependent thereon for water for such purposes; that, at the
 time of the commencement of this action, there was flowing in
 and down said river sufficient water to supply the reasonable
 needs and demands of all appropriators and users of water
 therefrom for domestic purposes, if carefully distributed,
 and with no more waste than is naturally incident to the
 customary manner of distributing water through open ditches
 and canals, but the water of said river was insufficient for
 the service of all desiring the use of the same for various
 other beneficial uses; that the plaintiff has and controls a
 large reservoir for the storage of water situate upon the
 said river above the head-gate of its said canal, wherein it
 is wont, from time to time, to store a large amount of
 surplus water, to be afterwards drawn off and turned into its
 canal for beneficial uses; that the defendant, as water
 commissioner of water district No. three, (3,) had shut down
 and closed, and threatened to keep shut down and closed, the
 head-gate of the plaintiff's said canal, and had thereby
 deprived the plaintiff of the means of obtaining water
 wherewith to supply the same to the persons so dependent upon
 it for water for domestic purposes, save at such times when,
 by reason of increased flow of water in the river, the
 plaintiff may be entitled to take water therefrom under and
 by virtue of its appropriation thereof for agricultural
 purposes. And the court doth further find, as a matter of
 law, that, when the waters of said river are not sufficient
 for the service of [1 Colo.App. 53] all those desiring the
 use of the same, those using the water for domestic purposes
 are entitled to divert and take the same, according to their
 respective priorities of appropriation thereof, for such
 purposes, notwithstanding any appropriation thereof by
 persons using the same for any other purpose. And the court
 doth further find and declare, as a matter of law, that the
 uses to which water may be applied, which are comprehended by
 the term 'domestic purposes,' hereinbefore employed
 and occurring in the constitution of this state, are as
 follows, and none other, that is to say: Household purposes,
 including water for drinking, washing, bathing, culinary
 purposes, and the like; water for such domestic animals as
 are used and kept about the house, such as work animals and
 cows kept to supply their owners and their families with
 dairy products; and such other uses, not being either
 agricultural or mechanical, as directly tend to secure and
 promote the healthfulness and comfort of the home. Wherefore,
 it is ordered and decreed by the court that the injunction
 heretofore allowed herein and served upon the defendant be,
 and the same is, hereby so modified as to operate and be
 effectual only as hereinafter decreed. It is ordered and
 decreed by the court that the defendant, John L. Armstrong,
 water commissioner in and for water district No. three, (3,)
 his successors in office, deputies, agents, and servants, do
 absolutely desist and refrain from closing or keeping closed
 the head-gate of the canal of the plaintiff, the Larimer
 County Ditch Co., for any period exceeding twenty (20) days
 at a time, and he is and they are strictly enjoined,
 required, and commanded, whenever water has been by them or
 any of them prevented from flowing from the Cache la Poudre
 river into said canal for the period of twenty (20) days, and
 he or they are thereunto requested by the plaintiff, to
 permit sufficient water to flow into said canal from said
 river for a period of not less than five (5) days, to supply
 water for domestic purposes to all persons residing along the
 line of said canal and dependent thereon for water for such
 purposes, and to enable such persons to fill cisterns and
 such like receptacles for [1 Colo.App. 54] the storage of
 water for such purposes: provided, that there be water
 flowing in said river to which other persons are not entitled
 by prior appropriation thereof for domestic purposes, and,
 further, that the plaintiff shall not have water at such time
 stored in its said reservoir. It is ordered and decreed that
 the plaintiff shall not, as against the rights of any prior
 appropriation of water for agricultural purposes, at any time
 when it has water stored in its said reservoir, be entitled
 to divert or take any water from the said river, not flowing
 down from its said reservoir. It is further ordered and
 decreed by the court that, except as herein and hereby
 modified, the injunction heretofore allowed be, and the same
 is, made perpetual; saving and reserving, however, to each
 party the right to move the court at any time so to modify
 this decree as to make it conform to the provisions of any
 law that may hereafter be enacted by the
 [27 P. 237] 
 general assembly of this state prescribing regulations
 relating to the distribution of water for domestic purposes.
 It is further ordered that each party pay its and his own
 costs incurred herein."
 
 
 J.M.
 Freeman and H.N. Haynes, for plaintiff in error.
 
 
 Frank
 J. Annis and Lyman Porter, for defendant in error.
 
 
 REED,
 J., (after stating the facts as above.)
 
 
 The
 question presented in this case for determination is of very
 grave importance,--purely a question of law; there was no
 controversy in regard to the facts. The testimony in this
 case establishes the facts that, prior to the inception of
 the scheme to construct the ditch of the defendant in error,
 and prior to January 1, 1876, water from the stream had been
 legally appropriated exceeding in volume 2,300 cubic feet per
 second, while the volume of the stream for the irrigating
 season of 1888 did not average over 700 cubic feet per
 second. Perhaps that season was an exceptionally [1 Colo.App.
 55] dry one, but it is not so shown. The canal in question,
 at its easterly extremity, 60 miles in a desert from the
 source of supply, was built in 1885 or later; and taking the
 testimony of the defendant in error as true, that that
 section of the country is absolutely uninhabitable unless
 supplied with water for domestic purposes from the canal, we
 must conclude that the settlers for whose use water was
 required in this suit settled in those years, as, from the
 facts shown, such settlements could not have antedated the
 completion of the canal, from absolute lack of water to
 sustain animal life. Here we find at a time when the stream
 was not supplying to those who had legally appropriated the
 water from 10 to 25 years before to exceed one-third of the
 supply adjudicated and decreed, the defendant in error
 applying to the courts for a further reduction and diversion
 for the benefit of the latest comers. All such attempts,
 especially when successful, are subversive of natural and
 statutory law and rights and the constitution of the state,
 and could not possibly be tolerated in a court of equity
 except upon the ground of the inexorable necessity of having
 water to sustain human life. On no other ground could the
 original plaintiff have had any standing in a court of
 equity.
 
 
 The
 question to be determined is, did the court err in decreeing
 the right of defendant in error to divert the water of the
 stream for distribution to settlers and patrons for domestic
 use, paramount and superior to the rights of those who had
 appropriated the same water for purposes of irrigation? In
 examining the right to the use of water for domestic
 purposes, under the facts of this case, and under the
 climatic and physical conditions incident to an arid,
 semi-desert country, very little assistance can be obtained
 from common-law sources, or the adjudications of older states
 where the same conditions do not exist. Doctrines of common
 law declaratory of the rights of riparian proprietors have
 very limited, if any, application. Before any general
 organization, territorial or otherwise, was or could have
 been had, a tide of [1 Colo.App. 56] emigration poured into
 the region comprised in the present state, and over the
 entire west. It was found an arid, semi-desert country. The
 land could only be made productive by the artificial use of
 water. The country was without law, but each individual
 brought with him the principles of equity and justice which
 were a part of his education. It was soon found that the
 water of the streams was inadequate to supply all the land.
 They found a new climate, new conditions calling for new laws
 applicable to the conditions. The first comer settled near
 the stream. In the absence of surveys he designated by
 landmarks the boundaries and extent of his occupation of
 land. He diverted--appropriated by such diversion--a certain
 amount of water from the stream, supposed to be sufficient.
 Others settled near him upon the same stream, and made a like
 appropriation. In time there were agricultural settlers
 enough to organize and establish a local government, and a
 series of rules or laws were adopted, perhaps in many
 instances crude and inartificially drawn, but embodying
 principles of equity and justice. They were recognized and
 obeyed, the setlers recognizing, as before stated, a fact
 which later corporations and settlers have not yet apparently
 recognized, or, if recognized, have disregarded, that the
 supply of water in the streams was not sufficient for all the
 land. Instead of parceling it out generally and making it
 practically valueless to any, following the course of
 California and other earlier settled territories where the
 same conditions existed, they adopted the only rule founded
 in equity that could be rightfully adopted in the premises,
 viz., that of prior appropriation, such appropriation to be
 controlled and limited. Such prior appropriation was so much
 as could be beneficially used upon the land for which the
 appropriation was made. This was the general well-regulated
 custom, hence a law, prior to and at the time of the
 organization of the territory; and, in the organic act
 creating the territory, it is said, (section 6:) "Nor
 shall any law be passed impairing the rights of private
 property." The right to water by prior appropriation was
 recognized [1 Colo.App. 57] by the first legislature of the
 territory, (see Laws 1861, p. 67;) and such rights continued
 to be recognized during the entire territorial existence. The
 general government, in which was the fee to both land and
 water at the time of the settlement, and for many years
 after, acquiesced in the disposition of the water according
 to local customs, and, in July, 1866, passed an act in which
 it provided (section 9) "that whenever, by priority of
 possession, rights to the use of water for mining,
 agricultural, manufacturing, of other purposes, have vested
 and accrued and the same are recognized and acknowledged by
 the local customs, laws, and the decisions of courts, the
 possessors and owners of such vested rights shall be
 maintained and protected in the same." The right to the
 water in the streams of Colorado, by prior appropriation,
 antedated any legislation. It was the common law of the
 people, and legislation, both national and territorial, was
 but a
 [27 P. 238.] 
 recognition declaratory of the right as it had theretofore
 and then existed. Neither in any territorial or national
 legislation do we find any provision or declaration of rights
 to water by appropriation, or to be acquired in any other
 manner, for domestic use. It is first found in the
 constitution of the state.
 
 
 Although
 water for domestic purposes is a necessity, and its use for
 that purpose a primary use, it seems that, from the small
 quantity required, and its use so inconsiderable compared
 with the quantity required for irrigation, it was regarded as
 incidental. Article 16, Â§ 5, is as follows: "The water
 of every natural stream, not heretofore appropriated, within
 the state of Colorado, is hereby declared to be the property
 of the public, and the same is dedicated to the use of the
 people of the state, subject to appropriation as hereinafter
 provided." And article 16, Â§ 6: "The right to
 divert unappropriated waters of any natural stream for
 beneficial uses shall never be denied. Priority of
 appropriation shall give the better right as between those
 using the water for the same purpose; but, when the waters of
 any natural stream are not sufficient for the service of all
 those desiring the use [1 Colo.App. 58] of the same, those
 using the water for domestic purposes shall have the
 preference over those claiming for any other purpose, and
 those using the water for agricultural purposes shall have
 preference over those using the same for manufacturing
 purposes." The error into which the learned judge seems
 to have fallen was in regarding these constitutional
 provisions as retrospective, and so far retroactive as to
 impair, if not destroy, property rights acquired long before
 its adoption. Such cannot be its construction. It must be
 construed to be declaratory of, and not destructive of, the
 rights and powers enjoyed by the people before its adoption.
 In the language of Mr. Webster, the great expounder of
 constitutional law: "Written constitutions sanctify and
 confirm great principles, but the latter are prior in
 existence to the former." 2 Webst. Works, 392. In
 Hamilton v. County Court, 15 Mo. 13, it is said: "What
 is a constitution, and what are its objects? It is easier to
 tell what it is not than what it is. It is not the beginning
 of a community, nor the origin of private rights; it is not
 the fountain of law, nor the incipient state of government;
 it is not the cause, but consequence, of personal and
 political freedom; it grants no rights to the people, but is
 the creature of their power, the instrument of their
 convenience. Designed for their protection in the enjoyment
 of the rights and powers which they possessed before the
 constitution was made, it is but the frame-work of the
 political government, and necessarily based upon the
 pre-existing conditions of laws, rights, habits, and modes of
 thought." And the language is quoted and adopted by
 Judge Cooley. Const. Lim. 47. And in regard to water-rights
 by prior appropriation the supreme court of this state has
 asserted the same general principle in Coffin v. Ditch Co., 6
 Colo. 446, in terse and comprehensive language, where it is
 said: "The right itself and the obligation to protect it
 existed prior to legislation on the [1 Colo.App. 59] subject
 of irrigation." See, also, Strickler v. City of Colorado
 Springs, (Colo.) 26 P. 313, (not yet officially reported.) By
 section 5 it will be seen that the prior appropriations of
 water were recognized, and in no way attempted to be
 affected, by the provisions of the constitution. The language
 is, "the water of every natural stream, not heretofore
 appropriated, *** is hereby declared to be the property of
 the public," etc., and, by section 6, "the right to
 divert any unappropriated waters of any natural stream,"
 etc., clearly showing that the provisions of the constitution
 were only to operate in the future, and only upon the water
 that was unappropriated at the time of their adoption. It is
 a well-settled rule of construction that all parts of an
 instrument are to be construed together, and harmonized if
 possible. To give the clause of section 6 the construction
 claimed would not only make it contradictory to the first
 part of the same section, but contradictory of section 5, and
 directly in conflict with section 15 of article 2, (bill of
 rights,) which declares "that private property shall not
 be taken or damaged for public or private use without just
 compensation." It follows from what has been said that
 the court erred in construing the section of the constitution
 as authorizing an interference, impairment, or injury of the
 rights of prior appropriators for irrigating purposes vested
 before the adoption of the constitution, for the purpose of
 supplying water for domestic purposes to later comers. See
 Strickler v. City of Colorado Springs, (Colo.) 26 P. 313. The
 suit as made should have been at once dismissed for want of
 equity. The right to the use of water is property; the title
 accrues by legal appropriation, and becomes vested as of the
 date of such appropriation. To divest such right and confer
 it upon another without compensation would be clearly an
 infraction of constitutional guaranties, and the inequitable
 character of the decree becomes at once apparent.
 
 
 For the
 reasons above stated the decree should be reversed, and the
 suit dismissed.