249 P.3d 1127 (2011)
Elmer A. KOBOBEL, Mariam M. Kobobel, Larry A. Kobobel, Glen D. Kobobel, David A. Knievel, and Margery A. Knievel, Plaintiffs-Appellants,
v.
STATE of Colorado, DEPARTMENT OF NATURAL RESOURCES, Division of Water Resources; Dick Wolfe, P.E., in his capacity as the Colorado State Engineer; and James R. Hall, in his capacity as Division Engineer of Water Division No. 1, Defendants-Appellees.
No. 10SA92.
Supreme Court of Colorado, En Banc.
March 28, 2011.
Rehearing Denied April 25, 2011.
*1129 Anderson and Chapin, P.C., Robert B. Chapin, Brush, Colorado, Hanson Bridgett LLP, Lyman D. Bedford, Larkspur, California, Attorneys for Plaintiffs-Appellants.
John W. Suthers, Attorney General, Patrick L. Sayas, Assistant Attorney General, General Tort Unit, Civil Litigation and Employment Law Section, Denver, Colorado, Attorneys for Defendants-Appellees.
Justice MÁRQUEZ delivered the Opinion of the Court.
This appeal is from an order of the District Court for Water Division 1 ("water court") dismissing the claims of Elmer A. Kobobel, Mariam M. Kobobel, Larry A. Kobobel, Glen D. Kobobel, David A. Knievel, and Margery A. Knievel ("well owners") against the State of Colorado, Department of Natural Resources, Division of Water Resources; Dick Wolfe, P.E., in his capacity as the Colorado State Engineer; and James R. Hall, P.E., in his capacity as Division Engineer of Water Division No. 1 ("State").
In 2006, the State issued cease and desist orders prohibiting the well owners from pumping water from their irrigation wells until the water court entered a decreed plan for augmentation. The well owners have complied with the cease and desist orders, but contend that the State's action has rendered their farming operations essentially worthless, thus entitling them to compensation for the unconstitutional taking of their vested property rights. We affirm the water court's judgment dismissing the well owners' claims.
As a threshold matter, we hold that the well owners' claims are water matters within the exclusive jurisdiction of the water court because the claim is predicated upon the well owners' right to use the water in their decreed wells. We further hold that the State's order curtailing the well owners' use of the water in their wells did not constitute a taking in violation of article II, section 15 of the Colorado Constitution or the Fifth and Fourteenth Amendments to the U.S. Constitution. *1130 The well owners' takings argument misconceives the scope of their water rights. The well owners neither hold title to the water in their wells, nor do they have an unlimited right to use water from their wells. What they possess is a legally vested priority date that entitles them to pump a certain amount of tributary groundwater from their wells for beneficial use. Under Colorado's prior appropriation doctrine, the well owners' vested priority date has always been subject to the rights of senior water rights holders and the amount of water available in the tributary system. Accordingly, the well owners hold no compensable right to use water outside the priority system or to cause injury to other vested water rights. Here, the State's cease and desist orders simply curtailed the well owners' out-of-priority diversions consistent with Colorado law. Because the well owners cannot show that the State infringed on a constitutionally protected property right, they are not entitled to just compensation for the "taking" of that alleged right. The water court therefore properly dismissed the complaint.

I. Facts and Procedural Background
The well owners own farmland and irrigation wells in Morgan County near the South Platte River. Collectively, they own thirteen decreed irrigation wells with dates of appropriation between March 1945 and December 1966.[1] In June 2006, the well owners received cease and desist letters from Water Division No. 1 of the Office of the State Engineer. The letters noted that the wells were part of the Central Colorado Water Conservancy District Well Augmentation Subdistrict ("Central WAS") plan for augmentation in water court Case No. 03CW099. The letters informed the well owners that, pursuant to an order of the water court, "Central WAS wells may not pump until the court has entered a decreed plan for augmentation."[2] The cease and desist orders did not prevent Central WAS wells from pumping in accordance with other approved decreed plans for augmentation or substitute water supply plans. However, based on Division of Water Resources records, the well owners' wells were not members of any other approved plan. Consequently, the Division Engineer ordered the well owners to immediately cease and desist using their wells to divert water.
According to their complaint, the well owners have complied with the orders and have neither pumped water from the wells nor irrigated the farmlands associated with the wells. Their inability to use the irrigation wells has rendered their farms and farming improvements essentially useless. The well owners further assert that they have exhausted all of their administrative remedies, and that any efforts to obtain an augmentation or substitute water plan would be futile.
In June 2007, the well owners brought an inverse condemnation complaint against the State in Morgan County District Court. The district court dismissed the complaint because it concluded that the well owners' takings claims involved water matters over which the water court had exclusive jurisdiction. The court of appeals affirmed, holding that the well owners' claims concerned the right to use water, not the ownership of water rights, and therefore were water matters within the exclusive jurisdiction of the water court. Kobobel v. State, 215 P.3d 1218, 1220-21 (Colo.App.2009), cert. denied, No. 09SC506, 2009 WL 2916987 (Colo. Sept.14, 2009).
*1131 Consequently, the well owners brought this action in the water court. The well owners submitted to the jurisdiction of the water court but continued to assert that the district court has proper jurisdiction over their inverse condemnation claims.
In their complaint before the water court, the well owners did not seek approval of an augmentation plan or substitute water supply plan. Instead, they again asserted that the State's action amounted to an unconstitutional taking of vested property rights in their wells, water, farmlands, and improvements, in violation of article II, section 15 of the Colorado Constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution. The well owners therefore sought just compensation for the damage to their property.
The water court dismissed the well owners' complaint under C.R.C.P. 12(b)(5). The court held that although the well owners owned the right to use the tributary groundwater decreed to their individual wells, this right was limited by the well owners' dates of priority: "While the Colorado Constitution protects [the well owners'] water rights and their attendant priority dates, [they] never had a right to use water outside the priority system or to cause injury to . . . other vested water rights."
The water court reasoned that, like all other well users in the state, to pump tributary groundwater using their decreed wells, the well owners must obtain plans for augmentation that replace out-of-priority depletions so as to prevent injury to other vested water rights. The court therefore concluded that the State's action of curtailing out-of-priority depletions caused by the pumping of their wells was not an unconstitutional taking of the well owners' property rights. The court observed that the well owners retained their water rights and priority dates and could resume irrigating their farms once they obtained a lawful augmentation plan or substitute water supply plan.
The well owners appeal the water court's order directly to this court pursuant to section 13-4-102(1)(d), C.R.S. (2010).[3]

II. The Water Court's Jurisdiction
The well owners contend that the district court is the proper forum for their complaint because their claims for inverse condemnation are not "water matters" within the water court's exclusive jurisdiction. We disagree. The well owners' takings claims center on the right to use water, and therefore are water matters within the exclusive jurisdiction of the water court.[4]
To determine whether a court has subject matter jurisdiction, we must examine the nature of the claim and the relief sought. Dallas Creek Water Co. v. Huey, 933 P.2d 27, 38 (Colo.1997); Great W. Sugar Co. v. Jackson Lake Reservoir & Irrigation Co., 681 P.2d 484, 494 (Colo.1984). The well owners argue that their claims for inverse condemnation are not "water matters" as defined by section 37-92-302(1)(a), C.R.S. (2010).[5] They *1132 do not seek to restore the operational status of the wells, approval of an augmentation or substitute water plan, or injunctive or declaratory relief. They emphasize that the only relief they seek is just compensation for the loss of their farming operations, and that they are entitled to a jury determination on the amount to be awarded.[6]
As a rule, "[w]ater courts retain exclusive jurisdiction over all water matters." In re Tonko, 154 P.3d 397, 404 (Colo.2007); see also § 37-92-203(1), C.R.S. (2010) ("no judge other than the one designated as a water judge shall act with respect to water matters in that division"). Water matters include "those matters which [the 1969 Water Right Determination and Administration Act] and any other law shall specify to be heard by the water judge of the district courts." Id. (emphasis added); see also § 37-92-302(1)(a). A water judge is a district judge; the jurisdiction of a water court extends to ancillary claims that are interrelated with the use of water or that directly affect the outcome of water matters within the exclusive jurisdiction of the water court. See Crystal Lakes Water & Sewer Ass'n v. Backlund, 908 P.2d 534, 542-43 (Colo.1996); Oliver v. Dist. Court, 190 Colo. 524, 526-27, 549 P.2d 770, 771-72 (1976); Perdue v. Fort Lyon Canal Co., 184 Colo. 219, 223, 519 P.2d 954, 956 (1974).
In determining whether a claim constitutes a water matter, our cases have drawn a distinction between actions involving the use of water and those involving the ownership of a water right. Humphrey v. Sw. Dev. Co., 734 P.2d 637, 640-41 (Colo. 1987) ("Resolution of what constitutes a water matter turns on the distinction between the legal right to use of water (acquired by appropriation), and the ownership of a water right.") (emphasis in original). We have held that the district courts have jurisdiction over actions to determine the ownership of a water right. Crystal Lakes Water & Sewer Ass'n, 908 P.2d at 540 (stating that "an action to determine ownership of a water right falls within the general jurisdiction of the district courts of this state"). Examples of actions involving the ownership of a water right include quiet title proceedings, real estate matters, dissolution proceedings, and other civil actions in the district courts. Humphrey, 734 P.2d at 641. In contrast, actions to determine the use of water belong exclusively in the water courts. See In re Tonko, 154 P.3d at 402, 404 (holding that the district court properly dismissed a condemnation petition for lack of subject matter jurisdiction because the petitioners must first obtain water court adjudication of their right and priority to use water).
Here, the controversy does not center on who owns the water rights; it is undisputed that the well owners owned several decreed wells with respective dates of appropriation. Rather, the well owners' claims ultimately rest on the scope of their right to use their decreed water rights.[7] Put differently, before the well owners would be entitled to a jury determination of just compensation for the taking of their property, they must first establish that a taking occurred; specifically, that the State's curtailment order infringed on their right to use the water in their decreed wells. We conclude that the *1133 nature of the claim and relief sought here requires a court to determine whether the well owners had the right to use water from their wells without State interference. Such a determination is a water matter that falls uniquely within the jurisdiction of the water court. Cf. Bd. of Cnty. Comm'rs v. Park Cnty. Sportsmen's Ranch, LLP, 45 P.3d 693, 710-15 (Colo.2002) (affirming water court's analysis of property rights basis for claims of just compensation).

III. The Well Owners' Takings Claims
Turning to the merits, we hold that the State's order curtailing the well owners' use of the water in their decreed wells did not constitute a taking in violation of article II, section 15 of the Colorado Constitution or the Fifth and Fourteenth Amendments to the U.S. Constitution.
Both the United States Constitution and the Colorado Constitution prohibit the taking of private property for public use without just compensation. U.S. Const. Amend. V; Colo. Const. art. II, § 15.[8] A property owner may bring an "inverse condemnation" claim when state action has the effect of substantially depriving the property owner of the use and enjoyment of the property, but the State has not formally brought condemnation proceedings. Thompson v. City & Cnty. of Denver, 958 P.2d 525, 527 (Colo.App.1998). To prove an inverse condemnation claim, the property owner must establish: "(1) that there has been a taking or damaging of a property interest; (2) for a public purpose without just compensation; (3) by a governmental or public entity that has the power of eminent domain but which has refused to exercise it." Id.; see also Pub. Serv. Co. of Colo. v. Van Wyk, 27 P.3d 377, 386-87 (Colo.2001).
"A taking may be effected by the government's physical occupation of the land or by regulation." Animas Valley Sand & Gravel, Inc. v. Bd. of Cnty. Comm'rs, 38 P.3d 59, 63 (Colo.2001). Whether a taking has occurred is a question of law for a court to decide. Van Wyk, 27 P.3d at 386.
Here, the well owners contend the State's cease and desist orders amounted to a regulatory taking of their properties because the orders deprived the well owners of their vested rights to use the water in their wells and thereby precluded any economically beneficial use of their land. See generally, Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014-16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124-25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). In plain terms, the well owners can no longer irrigate their land; consequently, their farming operations have been rendered essentially worthless. They seek just compensation for these losses, contending that the State's action amounts to an unconstitutional taking of vested property rights in their wells, water, farmlands, and improvements.
The well owners raise two arguments to support their claims that the State's action amounts to an unconstitutional taking. First, they contend that the underground water appropriations here were made before the 1969 Water Right Determination and Administration Act ("1969 Act"), section 37-92-101 et seq., C.R.S. (2010), at a time when tributary groundwater in wells was not administered by the State. The well owners characterize these pre-1969 appropriations as akin to vested property rights in "unappropriated, nontributary groundwater" that have been taken by the State. Second, the well owners contend that the cease and desist orders amount to a regulatory taking because the State Engineer only recently acted to enforce changes in the regulatory scheme after decades of allowing the well owners to pump out of priority.
*1134 Both of the well owners' contentions fail because they fundamentally misapprehend the nature and scope of the water "right" allegedly taken. Although their wells were decreed with dates of appropriation before the 1969 Act, the well owners do not own an unqualified right to use the water in the wells. Rather, the well owners' right to use the water in their decreed wells has always been subject to the constitutional prior appropriation doctrine, which prohibits the use of water to the injury of senior water rights. Here, the State's action, albeit belated, merely enforced Colorado's long-standing doctrine in order to address the injurious effects of South Platte alluvial wells pumping out of priority. In short, the well owners have no constitutionally protected property interest in the unfettered use of the water in their wells; consequently, they cannot show that the State has "taken" their property by curtailing the out-of-priority use of their wells. The water court therefore correctly dismissed the well owners' takings claims.

A. The Nature of the Well Owners' Water Rights
Because the well owners' takings arguments are premised on critical misapprehensions about the nature of their water rights, we briefly review Colorado water law in order to clarify the nature of those rights, paying particular attention to how those rights have developed with respect to well pumping in the South Platte River Basin.
In Colorado, all surface and ground water is a public resource. Colo. Const. art. XVI, § 5 ("The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."); Colo. Const. art. XVI, § 6 ("The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose. . . .").

1. The Doctrine of Prior Appropriation
Although water is a public resource, the prior appropriation doctrine governs its use:
The first person to divert unappropriated water and to apply it to a beneficial use has a water right superior to subsequent appropriators from the same water resource. Once a water right has been adjudicated. . . it is given a legally vested priority date which entitles the owner to a certain amount of water subject only to the rights of senior appropriators and the amount of water which is available for appropriation.

A validly adjudicated water right gives its holder a special type of property right. The value of the property right is that it allows a priority to the use of a certain amount of water at a place somewhere in the hierarchy of users who also have rights to water from a common source such as a lake or river.
Navajo Dev. Co. v. Sanderson, 655 P.2d 1374, 1377 (Colo.1982) (emphasis added) (internal citations omitted); see also Empire Lodge Homeowners' Ass'n v. Moyer, 39 P.3d 1139, 1147 (Colo.2001), modified on denial of reh'g (Feb. 11, 2002) ("The property right we recognize as a Colorado water right is a right to use beneficially a specified amount of water, from the available supply of surface water or tributary groundwater, that can be captured, possessed, and controlled in priority under a decree, to the exclusion of all others not then in priority under a decreed water right.").
A water right is a usufructuary right, giving "its holder the right to use and enjoy the property of another without impairing its substance." Navajo Dev. Co., 655 P.2d at 1377. Thus, one does not "own" water but owns the right to use water within the limitations of the prior appropriation doctrine. See § 37-92-103(12), C.R.S. (2010) (defining "water right" as "a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same"); see also Cent. Colo. Water Conservancy Dist. v. Simpson, 877 P.2d 335, 347 (Colo.1994) (stating that "[o]wners of water rights have no title to the water in the river").

2. Scarcity and Relative Priorities
Given the demand for water, there can never be a "guarantee that there will be *1135 enough water to satisfy all claims to this scarce resource." Navajo Dev. Co., 655 P.2d at 1380. Accordingly, not only is one's property right in water uncertain in nature, but "its primary value is in its relative priority." Id. at 1376. Thus, "[a]djudication and administration are essential to protection of water rights." Empire Lodge, 39 P.3d at 1148.
Colorado operates its prior appropriation system based on three fundamental principles:
(1) that waters of the natural stream, including surface water and groundwater tributary thereto, are a public resource subject to the establishment of public agency or private use rights in unappropriated water for beneficial purposes; (2) that water courts adjudicate the water rights and their priorities; and (3) that the State Engineer, Division Engineers, and Water Commissioners administer the waters of the natural stream in accordance with the judicial decrees and statutory provisions governing administration.
Id. at 1147. Accordingly, the State Engineer and water courts play critical roles in administering and adjudicating water rights in the state.
When there is an insufficient supply of water to satisfy all water users, the State Engineer is charged with "curtail[ing] undecreed uses and decreed junior uses in favor of decreed senior uses." Id. at 1149; see also § 37-92-501(1), C.R.S. (2010) (empowering the State Engineer and Division Engineers to "administer, distribute, and regulate the waters of the state in accordance with the constitution of the state of Colorado, the provisions of [the 1969 Act] and other applicable laws"); § 37-92-502, C.R.S. (2010) (describing the authority of the State Engineer or Division Engineers to issue the orders necessary to regulate water usage). The risk of curtailment is inherent to Colorado water rights holders because water  particularly the water of the South Platte River  is an over-appropriated, relatively scarce resource. See Empire Lodge, 39 P.3d at 1149-50.

3. The South Platte River Basin
Although historically there had been little regulation of groundwater well pumping, by the 1960s there was growing conflict between surface and groundwater users because the use of largely undecreed wells was greatly increasing the withdrawal of tributary groundwater and thereby depleting the surface flows of rivers such as the South Platte River. See id. at 1150; Simpson v. Bijou Irrigation Co., 69 P.3d 50, 59-60 & 59 n. 7 (Colo.2003), modified on denial of reh'g (May 27, 2003); see also Lawrence J. MacDonnell, Colorado's Law of "Underground Water": A Look at the South Platte Basin and Beyond, 59 U. Colo. L.Rev. 579, 585 (1988) (explaining that the number of wells in the South Platte River Basin increased from approximately 250 wells in 1933 to 3200 wells in 1970); P. Andrew Jones, South Platte Well Crisis, 2002-2010: Evolving Alluvial Groundwater Regulation, The Water Report, Issue No. 78, Aug. 15, 2010, at 2-3 ("By 2002, there were approximately 8,200 high capacity wells installed in the South Platte alluvium  pumping approximately 500,000 [acre-feet] of water annually."); Lain Strawn, Comment, The Last GASP: The Conflict Over Management of Replacement Water in the South Platte River Basin, 75 U. Colo. L.Rev. 597, 605-06 (2004).
After this Court acknowledged the detrimental impact of well pumping on senior surface water rights holders in Fellhauer v. People, 167 Colo. 320, 331-32, 447 P.2d 986, 991-92 (1968), the General Assembly enacted the 1969 Water Right Determination and Administration Act. Empire Lodge, 39 P.3d at 1150; Bijou Irrigation Co., 69 P.3d at 59-60. The 1969 Act declared that it was state policy "to integrate the appropriation, use and administration of underground water tributary to a stream with the use of surface water, in such a way as to maximize the beneficial use of all of the waters of this state." See ch. 373, sec. 1, § 148-21-2(1), 1969 Colo. Sess. Laws 1200 (currently codified at § 37-92-102(1)(a), C.R.S. (2010)).
As a result, "wells were required to be integrated into the priority system, although unadjudicated wells in existence prior to 1969 were allowed to continue." Bijou Irrigation *1136 Co., 69 P.3d at 60. To encourage the adjudication of existing wells, well owners who filed an application by July 1, 1971, would "receive a water decree with a priority dating back to their original appropriation date." Id. To enhance water users' flexibility in using water out of priority, the Act provided for the use of augmentation plans. Empire Lodge, 39 P.3d at 1150.
In 1974, the General Assembly authorized the State Engineer to grant temporary approval of augmentation plans. Id. at 1151. The State Engineer thereafter adopted rules for approving temporary augmentation plans for out-of-priority groundwater depletions in the South Platte River Basin. In the Matter of the Rules and Regulations Governing the Use, Control, and Protection of Surface and Ground Water Rights Located in the South Platte River and its Tributaries (Mar. 15, 1974), http://water.state.co.us/DWRDocs/Rules/Pages/UandMRules.aspx (last visited Mar. 24, 2011); see also Bijou Irrigation Co., 69 P.3d at 56; MacDonnell, supra, at 607-08. Accordingly, various South Platte well owners formed the Groundwater Appropriators of the South Platte River Basin, Inc. ("GASP"). MacDonnell, supra, at 590-91. GASP provided replacement water for groundwater well pumpers through various methods and the State Engineer approved GASP's replacement plans on a year-to-year basis, which permitted GASP members to pump out of priority. Id. at 591-96, 604-05; see also Jones, supra, at 7; Colorado State University Water Resources Archive, Morgan Library, Fort Collins, Colorado, http:// lib.colostate.edu/archives/findingaids/water/wgas.html (last visited Mar. 24, 2011).
In 1977, however, the General Assembly repealed the State Engineer's authority to approve temporary augmentation plans in response to concerns about lack of notice to potentially injured water right holders. Empire Lodge, 39 P.3d at 1151-52. Accordingly, in 2001, this Court ruled that plans for augmentation require water court approval. Id. at 1153-55. In 2003, we further held that the State Engineer's water rule power "does not extend to State Engineer authorization of out-of-priority groundwater depletions requiring `replacement plans' that are not conditioned on an augmentation plan application having been filed in water court." Bijou Irrigation Co., 69 P.3d at 55; see also § 37-92-308(3)(a), C.R.S. (2010) (providing that, beginning in January 2006, groundwater diversions from wells operating in the South Platte River Basin "shall be continuously curtailed" unless the wells are included in a plan for augmentation approved by the water judge, are included in an approved substitute water supply plan, or can be operated under their own priorities without augmentation); Jones, supra, at 8 (describing 2002 as being a "perfect storm" for South Platte well users, who were confronted with this Court's decisions in Empire Lodge and Bijou Irrigation Co. as well as a severe drought).
GASP ceased operations following these events. Accordingly, the well owners here, who belonged to GASP, no longer have access to replacement water through the organization. Cf. id. at 9-10 (explaining that, as of August 2010, 3,700 out of the 8,200 wells that were permitted to draw water from the South Platte alluvium in 2002 are not enrolled in any court augmentation plan and have been completely curtailed).

4. Presumption of Injury for Groundwater Well Pumping
The well owners in the instant case were pumping tributary groundwater, and thus are subject to the presumption that groundwater depletion from well pumping is causing material injury to senior appropriators.
Tributary groundwater is by definition hydrologically connected to the surface water of a stream. Therefore, groundwater pumping can deplete water that would otherwise be available for withdrawal directly from the surface of the stream. In recognition of this fact, absent a showing to the contrary, Colorado law presumes that (1) groundwater is tributary to the stream, and (2) that where surface water is over-appropriated, groundwater depletion through well pumping causes material injury to senior appropriators.
Bijou Irrigation Co., 69 P.3d at 59 n. 7 (internal citations omitted); see also Safranek *1137 v. Town of Limon, 123 Colo. 330, 334, 228 P.2d 975, 977 (1951) (explaining that under Colorado law, all ground water is presumed to be tributary to a stream and is "subject to appropriation as part of the waters of the stream"). In the order dismissing the well owners' complaint, the water court correctly observed that, "[l]ike all other well users in the state, to pump tributary groundwater using their decreed wells, the [well owners] must obtain plans for augmentation that replace out-of-priority depletions so as to prevent injury to other vested water rights."

B. Application of the Prior Appropriation Doctrine to the Well Owners' Claims
In accordance with Colorado's doctrine of prior appropriation, the well owners neither hold title to the water in their decreed wells, nor is their right to use the water unfettered. What the well owners possess is a legally vested priority date that entitles them to pump a certain amount of tributary groundwater from their wells for beneficial use, subject to the rights of senior water rights holders and the amount of available water. Consistent with those rights, the State's cease and desist orders curtailed the well owners' ability to pump water out of priority to the injury of senior water rights without a court approved augmentation or substitute water supply plan. Simply put, the State's order did not deprive the well owners of any constitutionally protected right to the unfettered use of the water in their wells; the well owners have no such right. Accordingly, the well owners are not entitled to just compensation because the State's action did not amount to an unconstitutional taking of their property.[9]

1. The Effect of the Water Right Determination and Administration Act of 1969
The well owners emphasize that they, or their predecessors-in-interest, made underground water appropriations before the 1969 Act, at a time when ground water was not yet appropriated or legally tied to the river as tributary water. They contend that the 1969 Act preserved the status of their vested rights in this water by including a provision stating that vested property rights would be protected. See ch. 373, sec. 1, § 148-21-2(2)(a), 1969 Colo. Sess. Laws 1201 ("Water rights and uses heretofore vested in any person by virtue of previous or existing laws, including an appropriation from a well, shall be protected subject to the provisions of this article.") (currently codified in slightly modified form at § 37-92-102(2)(a), C.R.S. (2010)).
The well owners' argument overlooks the fact that Colorado's prior appropriation doctrine long predates the 1969 Act. See, e.g., Coffin v. Left Hand Ditch Co., 6 Colo. 443, 447 (1882) (noting that the territorial legislature in 1864 recognized the doctrine of prior appropriation). Indeed, "[t]he right to the water in the streams of Colorado, by prior appropriation, antedated any legislation. It was the common law of the people, and legislation, both national and territorial, was but a recognition declaratory of the right as it had theretofore and then existed." Armstrong v. Larimer Cnty. Ditch Co., 1 Colo.App. 49, 57, 27 P. 235, 237-38 (1891).
*1138 The 1969 Act's language stating that water rights vested prior to 1969 "shall be protected subject to the provisions of this article," does not alter the fact that the well owners' water rights have always been subject to the prior appropriation doctrine enshrined in article XVI, sections 5 and 6 of the Colorado Constitution.
If anything, the 1969 Act confirmed the longstanding principle that senior water rights must be protected. For example, the Act provides that "[t]he existing use of ground water . . . shall be recognized to the fullest extent possible, subject to the preservation of other existing vested rights. . . ." (Emphasis added.) Ch. 373, sec. 1, § 148-21-2(2)(b), 1969 Colo. Sess. Laws 1201 (currently codified at § 37-92-102(2)(b), C.R.S. (2010)). Similarly, the 1969 Act authorizes out-of-priority diversions that operate under the terms of decreed augmentation plans but limits the use of this tool in accord with the principle of non-injury to senior water rights holders. Empire Lodge, 39 P.3d at 1150; see also § 37-92-103(9), C.R.S. (2010) (defining plan for augmentation); § 37-92-304(3), C.R.S. (2010) (providing that an applicant for a plan for augmentation has the "burden of showing absence of any injurious effect").
The 1969 Act preserved Colorado's prior appropriation doctrine. We therefore reject the contention that, because the well owners' water rights predate the 1969 Act, they possess a special right to pump water from their wells out of priority without regard to injury to senior rights holders. As discussed below, the State did not take away vested rights to use the water. The well owners lost their ability to pump from their wells because the State acted, albeit slowly, to enforce senior water rights in accordance with the prior appropriation doctrine in effect long before the 1969 Act.

2. Changes in Enforcement
The well owners also emphasize that, even after the Act took effect, they irrigated their crops for decades; the State Engineer did not administer their wells until 2006, when the cease and desist orders issued. The well owners contend that, in light of this long period of use, the State Engineer's orders that they stop pumping their wells constituted a regulatory taking for which they deserve just compensation.
It is true that the State did not enforce limitations on groundwater well pumping until relatively recently. The fact that the well owners enjoyed several decades of groundwater well pumping, however, does not change the fact that their right to water usage has always been limited by the constitutional prior appropriation doctrine. Indeed, the well owners themselves seemed to acknowledge this fact when they participated in GASP to obtain replacement water so they could pump out of priority.[10] The cease and desist orders represent a change in enforcement, not a change in law. As discussed above, the 2006 curtailment orders did not take away the well owners' vested property rights to the use of their wells because the well owners never possessed an unfettered right to pump out of priority. Instead, by acting to stop the well owners from continuing to pump water out of priority, the State is enforcing the principle  enshrined in the state constitution and predating the 1969 Act  that they may not pump to the injury of senior appropriators. Such action does not constitute a regulatory taking.

*1139 C. The Water Court's Dismissal of the Well Owners' Complaint
Finally, the well owners contend that the water court erred by dismissing their complaint without holding an evidentiary hearing. We hold that the water court applied the proper standard in granting the State's motion to dismiss and did not err by not holding an evidentiary hearing.
A C.R.C.P. 12(b)(5) motion to dismiss for failure to state a claim upon which relief can be granted tests the formal sufficiency of a plaintiff's complaint. Pub. Serv. Co. of Colo. v. Van Wyk, 27 P.3d 377, 385 (Colo.2001). A motion to dismiss "is looked upon with disfavor, and a complaint should not be dismissed unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her to relief." Id. at 385-86 (emphasis in original).
In reviewing a motion to dismiss, the court must accept all averments of material fact as being true, and all the allegations in the complaint must be viewed in the light most favorable to the plaintiff. Id. at 386. A court is to determine whether a claim is stated by considering only the facts averred in the complaint. Id.
For the reasons discussed above, the water court did not err in granting the State's motion to dismiss because the well owners could not prove any set of facts to support a takings claim. No evidentiary hearing was necessary because, as a matter of law, the well owners had no right to pump water to the injury of senior water rights without an augmentation or substitute water supply plan.

IV. Conclusion
We are not unmindful of the devastating impact that the cease and desist orders have had on the well owners, who find themselves without irrigation water from their wells. However, to conclude that the State's cease and desist orders here amounted to an unconstitutional taking necessarily would require us to rule that the well owners had an unfettered right to use water in derogation of senior water rights holders. Such a ruling would disregard Colorado's time-honored prior appropriation doctrine. Thus, for the reasons stated above, we affirm the water court's dismissal of the well owners' takings claims.
Justice EID, dissenting.
The well owners in this case allege a single claim: namely, that their right to use water has been so restricted by state regulation that the regulation amounts to a taking of their property without compensation. Because their regulatory takings claim necessarily implicates issues of ownership appropriate for determination in district court, I respectfully dissent from the majority's jurisdictional ruling.
The majority finds that because the well owners' claim involves a question of water use, jurisdiction is appropriate in water court. Maj. op. at 1132. While I agree that the claim involves questions of use, I disagree with the majority's assertion that the case does not implicate ownership as well. Id. The well owners' claim alleges that, by entirely depriving them of their ability to irrigate, the state has committed a regulatory taking  in effect, the state now "owns" their right to use water and compensation is due. See Bd. of Cnty. Comm'rs v. Flickinger, 687 P.2d 975, 983 (Colo.1984); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Accordingly, the well owners' claim, by definition, involves an issue of ownership that is properly considered in district court. See § 38-1-102(1), C.R.S. (2010) (specifying that an eminent domain proceeding must proceed by filing a petition in district court).
The majority resolves the tension between water court and district court jurisdiction in this case by having the water court consider the merits of the well owners' takings claim. Maj. op. at 1132 n. 6. If the takings claim is found to be meritorious, the water court would presumably be required to transfer the claim to district court for the empanelment of a jury to determine what compensation is due. Id. at 1132 ("[B]efore the well owners would be entitled to a jury determination [in district court] of just compensation for the taking of their property, they must *1140 first establish [in water court] that a taking occurred."). In my view, the majority's "water court merits review" approach is problematic.
First, the eminent domain statute specifies that takings claims are to be filed in district court. § 38-1-102(1); see also City of Northglenn v. Grynberg, 846 P.2d 175, 178 (Colo. 1993) (an inverse condemnation action is "to be tried as if it were an eminent domain proceeding") (internal citation omitted). The statute does not contemplate a bifurcated proceeding such as that envisioned by the majority, whereby a district court would not hear the merits of a takings claim, but could empanel a jury for determining compensation when a taking had been established in water court or other forum. Second, the majority's position is needlessly duplicative. Under the majority's approach, the evidence that persuaded the water court to find that a taking had occurred would have to be repeated for a jury empanelled by the district court for the purpose of determining compensation. § 38-1-106, C.R.S. (2010) (an eminent domain claimant may demand a jury trial to determine the compensation due, if any).
There may be cases in which both use and ownership issues are raised, but where use issues predominate; water court jurisdiction would be appropriate in such cases. See Crystal Lakes Water & Sewer Ass'n v. Backlund, 908 P.2d 534, 543 (Colo.1996) (water court jurisdiction extends to ancillary non-water issues). Here, by contrast, the well owners brought a single inverse condemnation claim, and, by conceding that the state engineer's cease and desist order was proper, conceded many of the "use" issues that would be appropriate for water court determination. Such a case is properly heard in district court. Because I would hold that this case should have proceeded in district court, I would not reach the merits of the well owners' claim. Accordingly, I respectfully dissent.
NOTES
[1] Although the well owners did not adjudicate their rights in their various irrigation wells until after the 1969 Water Right Determination and Administration Act, they obtained decrees after 1969 confirming dates of appropriation between 1945 and 1966.
[2] This Court recently affirmed the water court's ruling approving WAS's proposed plan for augmentation with certain terms and conditions. Well Augmentation Subdistrict of Cent. Colo. Water Conservancy Dist. v. City of Aurora, 221 P.3d 399 (Colo.2009), modified on denial of reh'g (Dec. 14, 2009). The matter involved "seven applications filed in 2003 by twenty-two individual well owners and the South Platte Well Users Association." Id. at 404. The Central Colorado Water Conservancy District formed WAS in 2004, and WAS became the primary applicant in that case, representing 215 wells in locations from Brighton to Fort Morgan. Id. The record before us implies that the well owners here were not part of the decreed plan of augmentation in that matter.
[3] The issues presented to us for review are:

1. Did the water court apply the correct standards in granting defendants' motion to dismiss?
2. Was the water court's dismissal of plaintiffs' inverse condemnation claims within the scope of its jurisdiction?
3. Did the water court err in holding that plaintiffs had no property rights capable of being taken?
4. Did the water court err, as a matter of fact and law, in holding that the cease and desist orders did not constitute a taking of plaintiffs' property?
5. If the water court had jurisdiction to rule on the inverse condemnation issues, was it error to do so without an evidentiary hearing?
[4] Although this court denied discretionary certiorari review of this issue in the Morgan County District Court case, see Kobobel v. State, 215 P.3d 1218, 1220-21 (Colo.App.2009), cert. denied, No. 09SC506, 2009 WL 2916987 (Colo. Sept.14, 2009), the question of jurisdiction is now squarely presented in this direct appeal and we therefore address it.
[5] Water matters described in section 37-92-302(1)(a) include the determination of water rights and conditional water rights; a determination that a conditional water right has been made absolute; changes of water rights; approvals of plans for augmentation; findings of reasonable diligence with respect to a conditional water right; approval of a proposed or existing exchange of water; and approval to use water outside the state.
[6] We note that the well owners argue that the State's exercise of its eminent domain powers, including inverse condemnation, is subject to proceedings governed by the eminent domain statutes, section 38-1-101 et seq., C.R.S. (2010), and, under these statutes, an inverse condemnation claimant is entitled to a jury to determine compensation. See § 38-1-102(1), C.R.S. (2010) ("the party authorized to take or damage the property" must "apply to the judge of the district court where the property or any part thereof is situate[d] by filing with the clerk a petition"); § 38-1-106, C.R.S. (2010) (owner of property "may demand a jury of freeholders residing in the county in which the petition is filed to determine the compensation" to be awarded). The well owners contend the water court has no jurisdiction over eminent domain proceedings and is not empowered to empanel a jury to award compensation. Because we conclude the well owners do not have an unrestricted right to use the water in their wells, and therefore cannot establish that a taking has occurred as a matter of law, we are not called on to consider procedural questions that might arise in a valid water takings claim.
[7] Indeed, the well owners allege in their complaint that the alleged "taking" denied them the "use of vested property rights" in their wells. (Emphasis added.)
[8] The Colorado Constitution differs slightly from the Fifth Amendment to the U.S. Constitution. The Colorado Constitution provides that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." Colo. Const. art. II, § 15. The "damage" provision was intended "to grant relief to property owners who [have] been substantially damaged by the making of . . . public improvements abutting their lands, but whose land has not been physically taken by the government." City of Northglenn v. Grynberg, 846 P.2d 175, 179 (Colo. 1993).
[9] We note that it is possible to assert a valid takings claim in a water rights context. For example, this Court has observed that a governmental entity holding a junior water right may not take water for domestic purposes and thereby interfere with senior water rights without just compensation. See, e.g., Town of Sterling v. Pawnee Ditch Extension Co., 42 Colo. 421, 427, 94 P. 339, 341 (1908) ("That a city or town cannot take water for domestic purposes which has been previously appropriated for some other beneficial purpose, is so clear that further discussion seems almost unnecessary."); Strickler v. City of Colorado Springs, 16 Colo. 61, 74, 26 P. 313, 317-18 (1891) (holding that owners of senior water rights "are entitled to compensation . . . before the same can be taken or injuriously affected" by a city's attempt to acquire a supply of water). Critical to our conclusion, however, was the fact that the owners' water rights were senior to those of the government. Sterling, 42 Colo. at 427, 94 P. at 341; Strickler, 16 Colo. at 73, 26 P. at 317. As a result, we held the government could not use water out of priority  even for a constitutionally "preferred" purpose  without just compensation to the senior water rights holders. In contrast here, the well owners merely are being prevented from exercising their junior water rights to the detriment of senior rights.
[10] One commentator has observed that while the State Engineer's office used "its authority to liberally grant SSPs [substitute (water) supply plans], effectively turning a stopgap measure into a means of indefinitely evading the adjudicatory process mandated by the statute," Strawn, supra, at 601, "GASP's members cannot put forth a convincing case that they are innocent victims. GASP members can unequivocally be described as a sophisticated, highly knowledgeable group, capable of understanding the laws governing their wells. . . ." Id. at 630. Under the arrangements with the State Engineer's office, "no specific quantity of replacement water was ever documented and it allowed GASP's members to avoid individually accounting for the depletions their wells caused to the river." Id. at 614-15. "[M]any with decreed augmentation plans were troubled by inequities stemming from the fact that GASP's members had been operating under SSPs for the last thirty years [when] [t]he 1969 Act clearly intended SSPs to be a temporary measure until new appropriators obtained a decreed augmentation plan. . . ." Id. at 617.